[Civ. No. 6990. Fifth Dist. Oct. 7, 1983.]

WILLIAM T. AMES, Plaintiff and Appellant, v.
BOARD OF RETIREMENT OF TULARE COUNTY,
Defendant and Respondent.

COUNSEL

Ferrari, Cole & Tusan and Thomas J. Tusan for Plaintiff and Appellant.

Thomas D. Bowman, County Counsel, Lita O'Neill Blatner, Assistant County Counsel, Steven B. Bassoff, Kathleen Bales-Lange and Roger B. Coffman, Deputy County Counsel, for Defendant and Respondent.

**OPINION**

**ZENOVICH, Acting P. J.**—This is an appeal from an order of the Superior Court of Tulare County denying a writ of mandate that would have required respondent, Board of Retirement of Tulare County, to classify appellant, a correctional officer II in the sheriff's office, as a "safety member" in the Tulare County Employees Retirement Association. The trial court found that appellant failed to show that his principal duties consisted of "active law enforcement" as defined in Government Code section 31469.3, subdivision (b).

FACTS[1]

Appellant was initially employed by the County of Tulare in October 1977 in the position of group supervisor I. He was assigned at Glenn Moran Hall, a juvenile detention facility under the probation department. His duties consisted of caring for wards of the juvenile court, supervision and maintenance of the hall. The group supervisor I position was classified as a safety member for retirement purposes. Appellant testified that when he was hired, the group supervisor test and physical were the same as for correction officers.

In August 1979, appellant transferred to the correctional officer II position in the Tulare County Sheriff's Department, a position which is not classified as a safety member position for retirement purposes. The Tulare County Sheriff's Department took over the correctional center from the probation department in April 1977. At that time, the correctional officers were classified as group supervisors.

The Tulare County Correctional Center is a combination minimum security and medium security facility. The largest portion of the center is unfenced, while the medium security area is a locked facility. The correctional center has a mess area, common area, shop area and living quarters or barracks. Inmates at the center are offered a variety of vocational and educational programs, as well as bible study groups, drug abuse and alcohol abuse programs.

As mentioned above, the correctional center is operated by the Tulare County Sheriff's Department but, with the exception of Lieutenant Peabody who is the supervisor, the center is staffed by correctional officers. There are no deputy sheriffs employed at the correctional center.

---

[1]The facts are derived from the reporter's transcript of the hearing before the County of Tulare Board of Retirement.

In order to be placed at the correctional center an inmate must pass through a screening process conducted by Lieutenant Peabody and Lieutenant Johnson, the administrator of the county jail. Inmates considered violent or potentially violent are not placed at the correctional center. If an inmate has a prior escape or a minor hold, he is placed in the medium security section. If an inmate has a major hold, he is placed at the county jail. The officers use their discretion in determining whether an inmate with prior drug offenses or disciplinary problems within the jail would be placed in the jail or the correctional center.

Appellant requested a hearing before the Tulare County Board of Retirement to consider his request to be put back into safety member status in connection with his duties as correctional officer II. A hearing was held before the board on June 11, 1981. The hearing was conducted in two parts. First, the board, along with counsel, took tours at the county jail and the correctional center. A second part of the hearing consisted of testimony from appellant and other witnesses relating to the duties of the correctional officers as well as duties of other law enforcement personnel in the county.

Two documents were submitted at this hearing relating to the job description for correctional officer II. The first document, the class specification for correctional officer II, defined the job in part as follows: "Under general supervision, to apply principles and practices of corrections in the care and custody of adult prisoners incarcerated in a minimum and medium security correctional facility and to do other work as required."

The major duties are described as follows: "Processes the receiving, detention and release of adult inmates; maintains institutional security on a 24 hour basis; supervises assigned groups of adults engaged in work details and leisure time activities; applies the policies and procedures of the Tulare County Sheriff's Department and the Tulare County Correctional Center; confers with the shift sergeant on problem situations; writes reports of activities; assists Correctional Officer I; operates and maintains fire suppression equipment including an assigned County fire truck; appears in court as a witness; maintains the chain of evidence related to criminal prosecution and internal disciplinary matters; investigates incidents of inmate misconduct and victimization; acts in place of the shift sergeant in some instances; attends training programs; insures good relations with the visiting public while providing information and giving directions; utilizes appropriate techniques and methods used in all phases of the work."

A correctional officer II is expected to have knowledge of "Laws and regulations pertaining to the care and custody of inmates; Health and Safety Code and Penal Code; institutional policies and practices; dangerous drugs;

court procedures; basic first aid and safety practices and procedures; inventory record keeping; basic math; U.S. monetary system; recreational games; cleaning implements and methods." A correctional officer II is expected to be skilled in ·"recognizing unusual activities and emergency situations and taking appropriate action; recognizing contraband such as weapons and drugs; *commanding and using authority in inmate supervision*; helping inmates resolve practical life problems; *properly restraining inmates*; . . ." (Italics added.) In addition, a correctional officer II is expected to possess a sense of smell sufficient to identify prohibitive substances and detect smoke and fires and is expected to have *"sufficient use of extremeties* [*sic*] *and strength to maintain security;* manual dexterity to write legibly; *endurance to run down inmates;* capability to work under conditions of high and low temperatures, dust and odors." (Italics added.) Finally, a correctional officer II is expected to be *willing to* "work in a confined area with inmates," perform skin searches, and *"use physical force and take a life if necessary*; . . ." (Italics added.)

The second document describing appellant's job description was the performance appraisal form.[2] In this form, appellant was rated on inmate supervision, reports and record keeping, safety and security, facility operation, and training and coordination. Under the category of inmate supervision, the duties were listed as follows: "Processes receiving, detention and release of inmates. Supervises inmates following departmental & institutional policies and procedures. *Determines need for disciplinary action and acts accordingly.* Conducts inmate searches. Transports inmates. Helps resolve inmates problems both personal and interpersonal. *Subdues aggressive inmates and apprehends escapees.*" (Italics added.)

Under the category of safety and security, the following duties were listed: "Maintains institutional security. Screens incoming and outgoing mail, packages and phone calls. Searches visitors, vehicles, barracks and inmates. Operates and maintains fire suppression equip[ment]. *Prevents possible dangerous or emergency situations. Observes and responds to unsafe practices and situations.* Administers first aid and C.P.R. Operates communication equipment." (Italics added.)

Appellant, describing the duties he performed, stated that he transported inmates from the correctional center to hospitals and other medical facilities and during that time he was in charge of their custody. During these times, he was not accompanied by a sheriff's deputy and was the only person with

---

[2]*The* personnel analyst testified the appraisal form was more accurate of the actual job description. He stated the class specification form was not intended to be a comprehensive document but admitted it was used to let applicants know if they were qualified for the job.

the inmate other than the medical staff. In transporting the medium security inmates to the hospital, the correctional officers were required to put chains, handcuffs and leg irons on these inmates. When inmates were returned to the correctional center, the correctional officers would remove these restraints. Appellant further testified that he was responsible for conducting searches of inmates and these searches would be both pat-down and strip searches. He also stated correctional officers were called upon to make searches of visitors and other noninmates. On Sunday, visiting day, it was standard that almost every vehicle have at least a cursory type search. These searches were to be in the correctional officer's discretion. It was not necessary to get clearance from a deputy sheriff to conduct a search. In fact, appellant had conducted searches of visitors' vehicles that resulted in contraband being found. The contraband consisted of knives, ammunition, drugs and alcohol. Any items seized in such searches were marked by the correctional officer so that they could later be used as evidence in any prosecution. Appellant had been subpoenaed several times but never had to testify.

Appellant testified Lieutenant Peabody said that if an inmate was trying to escape or flee, "he expected you to chase them until . . . your tongue was hanging down to your chest, . . ."

Appellant also testified that he and other correctional officers were directed to stake out certain drug drop sites which were used to smuggle drugs into the inmates at the correctional center. Appellant recalled an incident when an inmate was apprehended by a correctional officer as the inmate was picking up drugs from a drop site. The correctional officer apprehended the inmate and seized the drugs. As the correctional officer was bringing the inmate and the drugs back to the correctional center, there was an attack on the correctional officer by other inmates, causing a minor injury to the correctional officer. In addition, some glass was broken after the inmates threw items into the windows. Appellant also stated that there had been an assault on a correctional officer by an escapee.

In checking inmates as they came back to the correctional center, the correctional officers were responsible for determining whether alcohol or drugs had been used by the inmates. The correctional officers would take urine specimens for toxicology reports.

The uniforms worn by the correctional officers were identical to those worn by the deputies at the jail facility and in the community, except that the badge of a correctional officer stated that he was a correctional officer.

Both appellant and Lieutenant Peabody testified that correctional officers rotate the tasks of supervising inmates, maintaining the activity schedule,

noting inmate counts and rule violations and completing paperwork. Appellant testified that correctional officers mingled freely with the inmates and that one correctional officer is stationed in the medium security section per shift. The shift at the medium security section of the facility lasts three months. The total number of correctional officers on duty at the minimum security section varied between three to five, depending on the shift. The inmate population for the correctional center ran between 200 to 300 persons.

Timothy Johnson, jail commander of the Tulare County Sheriff's Department, and Lieutenant Peabody pointed to differences between correctional officers and deputy sheriffs. Correctional officers receive approximately 80 hours of training as compared to 480 hours of training received by deputy sheriff candidates at the academy. In addition, deputy sheriffs have authority to carry weapons, whereas correctional officers do not have such authority. However, while the deputies are on duty at the county jail, they are *not* allowed to have their weapons with them. Also, it was stipulated that, as a correctional officer, appellant was not authorized under the law to make a technical arrest under the Penal Code. However, on numerous occasions, correctional officers found it necessary to physically detain inmates.

In denying the request of appellant to be placed in the safety membership class, the board found that the position of correctional officer II with the County of Tulare did not meet the criteria set forth by Government Code sections 31469.3, 31469.4 and 31470.2 for safety membership. The board found "the principal duties . . . do not consist of active law enforcement, active fire suppression, or active lifeguard service."

The trial court concurred with the board's interpretation that appellant's "principal duties" did not "consist of law enforcement."

### DISCUSSION

■■■ The term "safety member" is defined in Government Code section 31469.3[3] which provides in pertinent part that a safety member is "Any person employed by a county, . . . whose principal duties consist of active law enforcement or active fire suppression . . . ."

---

[3]Although all deputy sheriffs are included in the category of safety members, Government Code section 31469.4 also includes in safety membership job titles such as juvenile hall group counselors and probation officers as long as "the board of supervisors by resolution make the provisions applicable." Section 31470.2 provides that several occupations are eligible for safety member status, including turnkeys, aircraft pilots and investigators in the offices of the district attorney.

Appellant relies principally on the case of *Kimball* v. *County of Santa Clara* (1972) 24 Cal.App.3d 780 [101 Cal.Rptr. 353]. In *Kimball,* a correctional officer in the county sheriff's department injured in the line of duty sought a declaration that he was entitled to be paid leave of absence in lieu of temporary disability payments pursuant to Labor Code section 4850. This section provides, in part, for such in lieu leave for an officer or employee of a sheriff's office, but excludes employees whose function does not clearly come within the scope of " 'active law enforcement service.' " The trial court granted plaintiff's motion for summary judgment and the Court of Appeal affirmed the judgment of the trial court. The court held that the Legislature intended that the functions performed by the plaintiff be considered as within the scope of " 'active law enforcement service.' " (*Kimball, supra,* at pp. 787-788.)

The trial court quoted the job description for the position of correctional officer: " 'Supervises the conduct of inmates in living quarters, during meals and bathing, at recreation and on work assignments; maintains security of inmates by taking periodic counts and by surveillance of activities; supervises groups of inmates assigned to shop, farm, road, or other maintenance activities and insures that the work is performed properly; conducts shakedowns and confiscates contraband; inspects quarters for cleanliness and proper order; reports infractions of rules and regulations and irregular and suspicious occurrences; reports unauthorized absences and escapes; prepares written reports on the work, conduct, and habits of inmates and their adjustment to the program; may recommend assignment to work furlough program or return to more secure confinement at the main jail; exercises influence toward motivating inmates to modify their antisocial attitudes and behavior; orients new inmates to rules and regulations and advises and instructs them on their responsibilities; admits visitors with proper credentials within the authorized regulations and time schedule and advises them on the rules and procedures; and does other related work as required.' " (*Kimball* v. *County of Santa Clara, supra,* 24 Cal.App.3d at pp. 783-784.)

The court also relied on the plaintiff's uncontroverted declaration as to the duties he actually performed, which the court regarded as clearly coming within the scope of active law enforcement service. (*Id.,* at p. 785.)

The County of Santa Clara argued that since the Legislature made a specific exception for custodial officers who are employees of the Department of Corrections and the Youth Authority, the legislative intent was that all other employees who performed custodial duties are not to be deemed

to be engaged in active law enforcement. (*Id.*, at p. 786.) The court rejected this contention.[4]

Appellant also relies on this court's opinion in *Neeley* v. *Board of Retirement* (1974) 36 Cal.App.3d 815 [111 Cal.Rptr. 841]. In *Neeley,* the court below granted a peremptory writ of mandate ordering the County of Fresno Board of Retirement to grant the applications of two identification technicians in the county sheriff's office for classification as safety members for retirement purposes. We reversed, holding that the applicants were not engaged in "active law enforcement" within the meaning of Government Code section 31469.3. We pointed out that their duties, aside from infrequent emergency service, which is specifically excepted for safety member purposes under Government Code section 31470.3, consisted of classifying and researching fingerprints and photograph files and involvement in other highly technical identification techniques. We held that these duties did not place the applicants in contact with prisoners on a regular basis or expose them to hazards from prisoner conduct. The applicants did not risk injury from such sources and were not exposed to the necessity of being physically able to cope with potential dangers inherent in the arrest, detention and handling of the prisoners. (*Neeley, supra,* at p. 822.) We relied on the standards set in *Kimball, supra,* 24 Cal.App.3d 780, and also on the case of *Crumpler* v. *Board of Administration* (1973) 32 Cal.App.3d 567 [108 Cal.Rptr. 293].[5]

---

[4]In addition, the court noted an opinion of the Attorney General to the effect that the legislative intent in enacting Labor Code section 4850 was to insure that policemen would not be deterred from the zealous performance of the hazardous duties involved in their mission of protecting the public by fear of loss of livelihood and reasoned that it could not be seriously contended that the supervision of prison inmates by correctional officers is less hazardous than the supervision of the general public by policemen. (*Kimball, supra,* at pp. 784-785.)

[5]In *Crumpler,* the respondent employees were animal control officers whose principal duties involved the enforcement of state and local laws pertaining to the licensing, control and maintenance of animals. In performing these duties, the animal control officers sometimes used large police vehicles with police radios and were occasionally called on to serve as backup units at the scenes of crimes. After a hearing, the board of retirement determined they were not entitled to safety member status and accordingly had them reclassified into "miscellaneous membership." The animal control officers sought a writ of mandate in the superior court. The writ was granted and the board appealed. The Court of Appeal reversed, holding that the applicants' principal duties did not fall within the scope of active law enforcement. The *Crumpler* court quoted from an opinion of the Attorney General discussing the meaning of the term "active law enforcement" for the purpose of determining eligibility as a "safety member" under the County Employees' Retirement Law of 1937 (Gov. Code, §§ 31469.3-31470.3): "'. . . It is not possible to provide any more than a broad definition of what constitutes active law enforcement within the intendment of the County Employees' Retirement Law. We would say generally that it includes positions, the principal duties of which pertain to the active investigation and suppression of crime; the arrest and detention of criminals and the administrative control of such duties in the offices of the sheriff and district attorney. It is suggested that active law enforcement work means "physically active" work such as the arrest and detention of criminals. While the main reference is to duties which expose officers and employees to physical risk in the law enforcement field (see Gov.

In the instant case, at the hearing before the retirement board, Lieutenant Peabody was specifically asked if the correctional officers under his supervision and control performed each of the enumerated duties as described in the job description in the *Kimball* case. He responded in the affirmative as to almost every duty.

We believe the *Kimball* case is controlling. The job description and duties in *Kimball* are virtually identical with those in the instant case. Indeed, the court below acknowledged that "there are striking factual similarities between the duties described in the *Kimball* case as constituting active law enforcement and the duties described in the instant case." However, we disagree with the distinction made by the trial court below between the two cases. The court felt the key distinction between the two cases "lies in the extent of the hazardous nature of the officer's 'principal duties'"—noting that Mr. Kimball had personally made a dozen arrests. A careful review of the *Kimball* case does not indicate the length of time that Mr. Kimball had been a correctional officer. Neither does the case indicate whether the correctional officer was empowered to make a technical arrest. We would have to speculate as to whether or not Mr. Kimball actually had the authority to arrest, rather than the authority to apprehend and detain. Moreover, the duties of a correctional officer II in the instant case specifically require that the officer have the endurance to run down inmates and be willing to use physical force and take a life if necessary. Clearly, if a deputy or correctional officer found it necessary to run down an escaping inmate and use physical force to restrain him, the mere act of the capture and detention is the key to exposure to hazardous duty, not the legal power to institute a technical arrest. If a case is to be distinguished from *Kimball,* the key would be the differences in exposure to potentially hazardous situations inherent in regular contact with prisoners, not whether an officer has the legal power to make an arrest.

Neither do we agree with the trial court's notation that the minimum security nature of the Tulare County facility is exemplified by the fact that some shifts require only 3 correctional officers to supervise 200 to 300 inmates in a nonlockup setting. The court did not point out that the correctional officers were also required to supervise those inmates who were housed in the medium security section of the facility. Neither did the court seem to recognize that exposing 3 correctional officers to supervise 200 to 300 inmates in a nonlockup setting can certainly be potentially dangerous.

Code sec. 31901), we believe that the statute reaches persons who are supervising the performance of such duties in the sheriff's and district attorney's offices.' (22 Ops.Cal.Atty.Gen. at p. 229.)" (*Crumpler* v. *Board of Administration, supra,* 32 Cal.App.3d at p. 577; see also *Boxx* v. *Board of Administration* (1980) 114 Cal.App.3d 79, 83-88 [170 Cal.Rptr. 538].)

As we noted in *Neeley,* the key to finding "active law enforcement" is (1) contact with prisoners on a regular basis; (2) exposure to hazards from prisoner conduct; and (3) risk of injury from the necessity of being able to cope with potential dangers inherent in the handling of prisoners. (*Neeley v. Board of Retirement, supra,* 36 Cal.App.3d 815, 822.)

It is undisputed that a correctional officer II has contact with prisoners on a daily basis. Clearly, he is also exposed to hazards and risk of injury from prisoner conduct. Not only must he supervise and transport minimum security prisoners, but he must do the same with the medium security prisoners as well. His primary duty is to maintain security. He is expected to use authority with prisoners and is expected to have sufficient strength to restrain and run down inmates and to "use physical force and take a life if necessary; . . ."

■ In sum, we believe the *Kimball* and *Neeley* cases clearly dispose of the instant case. Despite respondent's contention that we should uphold the decision of the trial court because its decision is supported by substantial evidence, the fact is, as the trial judge here noted, *there was no substantial conflict in the evidence regarding the duties of appellant.* Accordingly, the proper interpretation of the statutory language is a question of law for the court. We are not constricted in this regard by the conclusions of the trial court: "In reviewing the decision of the Board of Retirement by administrative mandamus pursuant to Code of Civil Procedure section 1094.5, the trial court and this court are bound by the substantial evidence rule (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 149 [93 Cal.Rptr. 234, 481 P.2d 242]; *Bekiaris* v. *Board of Education* (1972) 6 Cal.3d 575, 592 fn. 11 [100 Cal.Rptr. 16, 493 P.2d 480]), the function of the trial and appellate courts being to determine if the record is free from legal error (*Griggs* v. *Board of Trustees* (1964) 61 Cal.2d 93, 96 [37 Cal.Rptr. 194, 389 P.2d 722]). *In this instance, however, as the trial judge noted, there was no substantial conflict in the evidence regarding the duties of the respondents and the relationship of those duties to law enforcement. Accordingly, the proper interpretation of the statutory language is a question of law for the court and we are not constricted in this regard by the conclusions of the trial court.* (Evid. Code, § 310; *Neal* v. *State of California* (1960) 55 Cal.2d 11, 17 [9 Cal.Rptr. 607, 357 P.2d 839], cert. den., 365 U.S. 823 [5 L.Ed.2d 700, 81 S.Ct. 708]; *Crumpler* v. *Board of Administration* (1973) 32 Cal.App.3d 567, 576-577 [108 Cal.Rptr. 293]; *Noroian* v. *Department of Administration* (1970) 11 Cal.App.3d 651, 654 [89 Cal.Rptr. 889].)" (*Neeley* v. *Board of Retirement, supra,* 36 Cal.App.3d at p. 819, italics added.) ■ We believe the trial court below erred in concluding that appellant's principal duties do not include "active law enforcement." There can be no doubt that appellant's job places him in contact with the prisoners

on a regular basis and is thus potentially hazardous. (*Id.*, at p. 822.) Accordingly, we hold that a correctional officer in Tulare County, such as appellant, is entitled to safety member status in the Tulare County Employees Retirement System.[6]

The judgment is reversed. The superior court is directed to vacate its order denying the writ and enter a new order granting appellant's petition for writ of mandate.

Martin, J., concurred.

**ANDREEN, J.**—I respectfully dissent.

Whether appellant's principal duties consist of "active law enforcement" within the meaning of Government Code section 31469.3, subdivision (b) is an issue of fact reviewable pursuant to the substantial evidence standard. (*Neeley* v. *Board of Retirement* (1974) 36 Cal.App.3d 815, 819 [111 Cal.Rptr. 841].) The majority avoids application of this standard of review, and purports to convert the determinative inquiry into an issue of law by concluding that there was no substantial conflict in the evidence before the trier of fact, reducing the dispositive analysis to statutory interpretation. (*Id.*, at pp. 819-823.)

The case under review should be distinguished from those in which the trial court is authorized to exercise its independent judgment on the evidence. (See for example, *Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301 [196 P.2d 20].) In such a case, the ultimate power of decision rests with the trial court and we review under the substantial evidence standard. But as *Neeley* makes clear, the issue before us does not call for an independent judgment review. Our scope of review is the same as that of the trial court—a review of the administrative record to determine whether it is supported by substantial evidence. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242].)

The present case differs from *Neeley* in a manner crucial to the analytical structure relied upon by the majority—the trier of fact herein toured the Tulare County jail facility and the correctional center branch facility. (The appellant worked at the latter.) "Whatever is viewed by a trial judge with the consent of the parties becomes independent evidence which can be considered by him in arriving at his conclusion . . . in support of findings

---

[6]We believe the dissent misperceives the importance of the tour of the correctional facility. As the trial court recognized, there appeared to be no dispute as to the physical characteristics of the correctional facility and there was no substantial conflict in the evidence.

consonant therewith. [Citation.] Such evidence may be used alone or with other evidence to support the findings. [Citation.]" (*Frustuck* v. *City of Fairfax* (1963) 212 Cal.App.2d 345, 361, 362 [28 Cal.Rptr. 357].) This rule applies with equal force to a view taken in administrative proceedings subject to review on application for mandamus. (*Ethel D. Co.* v. *Industrial Acc. Com.* (1934) 219 Cal. 699, 704-705 [28 P.2d 919].)

" 'It is clearly the rule in California that when the view of the trial judge is with the consent of the parties . . . what is then seen is itself evidence and may be used alone or with other evidence to support the findings. [Citations.]

" 'Within the compass of this rule, it is also well settled that when the trial judge views the premises and a record of what he saw has not been made a part of the transcript on appeal, an appellate court must assume that the evidence acquired by such view is sufficient to sustain the finding in question. [Citations.]' [Citation.]" (*City of Los Angeles* v. *Kossman* (1969) 274 Cal.App.2d 116, 120-121 [79 Cal.Rptr. 44].)

Although a tape recording was made of a portion of the tour taken by the administrative board, much of the recording was incomprehensible and no attempt was made to summarize the observations of physical features which were made. The inadequacy of the recording of the tour renders it useless to a reviewing court and does not take this case out of the general rule that an unreported view is substantial evidence alone sufficient to support the findings of the trier of fact.

Our prior decisions have recognized that classification as a safety member is largely controlled by the extent to which the job category at issue exposes its holders to hazardous activity. (*Neeley* v. *Board of Retirement, supra,* 36 Cal.App.3d at p. 822.) While a correctional officer stationed at a main jail facility may come into contact with and be required to supervise the entire gamut of pretrial and convicted detainees, including belligerent drunks and dangerous psychotics accused of violent felonies, the inmates at the facility at which appellant's duties were performed had been screened to eliminate those considered violent or potentially violent. In fact, the only incident in which a correctional officer had been injured in the four years prior to the administrative hearing in the present case resulted in a scratch on the officer's cheek. In making the factual determination as to the extent to which appellant's duties exposed him to hazard, the view of the main and branch jails was invaluable in assessing the risks created by the differing inmate populations of the two facilities.

Since we have no effective record of the evidence presented to the administrative board during its tour of the various jail facilities, it can hardly be

said that the evidence is without conflict and that this court may apply its independent notions of statutory interpretation to a "given" set of facts. (See *Neal* v. *State of California* (1960) 55 Cal.2d 11, 17 [9 Cal.Rptr. 607, 357 P.2d 839], cert. den., 365 U.S. 823 [5 L.Ed.2d 700, 81 S.Ct. 708].) "Great weight should be given to the administrative interpretation of the Board of Retirement unless clearly erroneous. (Gov. Code, § 31470.8; *Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132, 140 . . . .)" (*Neeley* v. *Board of Retirement, supra,* 36 Cal.App.3d at p. 820.)

In the severely constricted fiscal environment that Tulare County and all counties operate post-Proposition 13, a special privilege or status conferred upon one class of county employees utilizes resources which might otherwise serve a more compelling societal purpose. While it may have done little harm in the past to routinely extend the most favorable retirement status to any employees who were arguably engaged in law enforcement (see *Kimball* v. *County of Santa Clara* (1972) 24 Cal.App.3d 780 [101 Cal.Rptr. 353], relied upon by the majority), the majority's disregard of the factual findings of the administrative board in the present case—findings supported by a view of appellant's workplace not available to this court—cannot be justified in law or reason. Since the dispositive factual issue was resolved by the trier of fact against appellant, and since substantial evidence supports that resolution, the decision of the administrative board should be upheld. I would therefore affirm the judgment of the trial court.

A petition for a rehearing was denied November 3, 1983, and respondent's petition for a hearing by the Supreme Court was denied December 21, 1983.