[No. B034022. Second Dist., Div. Seven. Oct. 19, 1989.]

JOHN GLOVER, Plaintiff and Appellant, v.
BOARD OF RETIREMENT OF LOS ANGELES COUNTY
EMPLOYEES' RETIREMENT ASSOCIATION, Defendant and
Respondent.

**COUNSEL**

Lemaire & Faunce and Mark Ellis Singer for Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, and Bruce M. Hale, Deputy County Counsel, for Defendant and Respondent.

## OPINION

LILLIE, P. J.—Petitioner John Glover appeals from judgment denying his petition for writ of mandate seeking to reverse the decision of respondent Board of Retirement of the County of Los Angeles, that although he was disabled from performing the duties of his job, the disability was not service-connected. Appellant[1] contends that Glover's disability was service-connected because he was engaged in active law enforcement thus entitled to the heart trouble presumption of section 31720.5 of the Government Code; and that the finding that the disability is not service-connected is not supported by substantial evidence.

### FACTS

Glover had been a cook for 40 years, 25 of which he spent as a cook in the Navy. In 1971 he was employed by the County of Los Angeles, first as senior cook, then as head cook at various detention and jail facilities. On October 24, 1984, while working at his job as head cook at the Hall of Justice jail, he suffered a myocardial infarction; he was found by his kitchen clerk (a trusty) in the supply room with his head down resting on a table; he was in severe pain and had difficulty standing, and the trusty walked him to the kitchen gate area to ensure his safety; after being seen by a nurse, he was taken by ambulance to the hospital. Nothing indicates any particular incident precipitated the heart attack. It was stipulated Glover was permanently incapacitated for the performance of duty.

### Wayside Honor Rancho

Glover was assigned first to Wayside Honor Rancho, a minimum security prison, as senior cook; his duties were preparing and cooking meals and supervising food preparation by a kitchen staff of 10 inmates; they had access to knives, cleavers and pallets; occasionally the inmates got into arguments and fights among themselves; he had broken up fights. Sometimes deputy sheriffs were assigned to help him. His job was to prepare 3,400 meals a day and he worked an 8-hour tight schedule because if a meal is late "you have trouble" with the administration and with the inmates who like to eat on time.

### Hall of Justice Jail

After Wayside, Glover worked 7 years at the Hall of Justice jail as senior cook; his duties were "preparing, supervising of meals"; he was responsible

---

[1] Glover died pending appeal; an order of the superior court permitted his widow to continue the action as appellant.

for 4,500 meals a day; his crew of kitchen helpers was minimum security inmates; they were closely confined and he "continued watching and making sure that breaking up fights—sometimes I had to stop the job and had to go do something else until it cools off and restart it, again"; when this occurred he was more exhausted than usual; while working in the jail he was tense and tight, but when he was outside he relaxed.

*Biscailuz Center*

When the jail at Hall of Justice closed for renovation, Glover was transferred to Biscailuz Center where, as senior cook, he prepared 2,500 meals a day; he supervised 2 kitchen crews of inmates because he also cooked for the substations; there were occasional arguments and fights among the inmates and "just sometime" he dealt with the fights himself and sometimes he disarmed the inmates who used knives in the kitchen; however, there were deputy sheriffs there to help him.

*Central Jail*

With his transfer to Central Jail came a promotion as head cook; in this job he had civilian employees—7 or 8 food service workers, 30 senior cooks, and head cooks—as well as 40 inmates for his kitchen staff, and was responsible for 22,500 meals a day; his duties included administrative work such as ordering all food supplies, keeping records, making reports, etc.; he did some food preparation when there was a shortage of cooks "two or three times a week, sometimes"; he had more responsibility as head cook which gave him more stress; "you never know how the meal is going to turn out"; "dining room is kind of distant from the kitchen, and taking food by elevator and we never know what happened between there and the kitchen, and at the end of the meal, about three-fourths through, you found out you are short, and that you have to rush and do something else. That was really giving me problems because the inmates want what is on the menu and no substitutions. That is pretty stressful"; "sometimes" he broke up fights and arguments; there were a lot of civilian employees around.

*Hall of Justice Jail*

One year later, he returned to Hall of Justice as head cook; he had no food service workers there, but there were nine senior cooks; he performed the same duties as before plus butchering; knives used in food preparation were issued to the inmates by a deputy sheriff who kept them under lock and key and checked them in and out; he helped resolve disputes among his inmate staff, but he never had a personal fight with an inmate and was never threatened by one; however, because the inmates might be capable of

harming him, he kept a lookout at all times. The kitchen gate area which is staffed with deputy sheriffs who are there all the time, lies between the kitchen and elevator; if there were any problems the deputies there would assist him.

I

## NO ENTITLEMENT TO THE PRESUMPTION IN GOVERNMENT CODE SECTION 31720.5

We agree that pension legislation must be liberally construed, resolving all ambiguities in favor of appellant (*Gorman v. Cranston* (1966) 64 Cal.2d 441, 444 [50 Cal.Rptr. 533, 413 P.2d 133]; *Neeley v. Board of Retirement* (1974) 36 Cal.App.3d 815, 822 [111 Cal.Rptr. 841]); however, liberal construction cannot be used as an evidentiary device. It does not relieve a party of meeting the burden of proof by a preponderance of the evidence (See *Power v. Workers' Comp. Appeals Bd.* (1986) 179 Cal.App.3d 775, 787 [224 Cal.Rptr. 758]) or change the test on appeal. (See *Curtis v. Board of Retirement* (1986) 177 Cal.App.3d 293, 298 [223 Cal.Rptr. 123].)

While she is not claiming Glover was a "safety member" under section 31720.5 Government Code, as in *Ames v. Board of Retirement* (1983) 147 Cal.App.3d 906 [195 Cal.Rptr. 453] and *Kimball v. County of Santa Clara* (1972) 24 Cal.App.3d 780, 785 [101 Cal.Rptr. 353], appellant contends the evidence established that Glover is entitled to the heart trouble presumption contained in the statute[2] because he is "a member engaged in active law enforcement." To place Glover in this category, appellant relies mainly on *Ames v. Board of Retirement, supra,* 147 Cal. App.3d 906 and the criteria quoted therein from *Neeley v. Board of Retirement, supra,* 36 Cal.App.3d 815: "As we noted in *Neeley,* the key to finding 'active law enforcement' is (1) contact with prisoners on a regular basis; (2) exposure to hazards from prisoner conduct; and (3) risk of injury from the necessity of

[2] "If a safety member, a fireman member, or a member in active law enforcement who has completed five years or more of service under a pension system established pursuant to Chapter 4 (commencing with Section 31900) or under a pension system established pursuant to Chapter 5 (commencing with Section 32200) or both or under this retirement system or under the State Employees' Retirement System or under a retirement system established under this chapter in another county, and develops heart trouble, such heart trouble so developing or manifesting itself in such cases shall be presumed to arise out of and in the course of employment. Such heart trouble so developing or manifesting itself in such cases shall in no case be attributed to any disease existing prior to such development or manifestation.

"As used in this section, 'fireman member' includes a member engaged in active fire suppression who is not classified as a safety member.

"As used in this section, 'member in active law enforcement' includes a member engaged in active law enforcement who is not classified as a safety member." (See Gov. Code, § 31720.5.)

being able to cope with potential dangers inherent in the handling of prisoners. (*Neeley* v. *Board of Retirement, supra,* 36 Cal.App.3d 815, 822.)" (*Ames* v. *Board of Retirement, supra,* 147 Cal.App.3d 906, 916.)

Ames, a correctional officer in the sheriff's office, met the *Neeley* criteria. He was responsible for maintaining institutional security on a 24-hour basis and came in daily contact with prisoners in his custody. His principal duties were the supervision of prisoners, detection of criminal activities within the jail, search of prisoners, confiscation of contraband materials, investigation of disciplinary matters, transportation of prisoners, prevention of escapes and apprehension of escapees with whatever force was necessary. The court held that "His primary duty is to maintain security. He is expected to use authority with prisoners and is expected to have sufficient strength to restrain and run down inmates and to 'use physical force and take a life if necessary; . . .'" (147 Cal.App.3d at p. 916); and concluded that Ames's contact with prisoners on a regular basis was potentially hazardous, and he was entitled to the safety member status. (P. 917.) The same applied to Kimball, a correctional officer in county jail whose primary duty was supervision of prison inmates, and generally for the same reasons. (*Kimball* v. *County of Santa Clara, supra,* 24 Cal.App.3d 780, 785.)

But not so in the case of Neeley, an identification technician for the sheriff's office who did criminal identification work and did not come in contact with prisoners on a regular basis, although he was subject to 24-hour emergency call and occasionally was called out. (*Neeley* v. *Board of Retirement, supra,* 36 Cal.App.3d 815.) Establishing the three-prong test used in *Ames* and relied upon by appellant herein, the court held that while Neeley's activities were related to and essential to law enforcement, they did not place him in contact with prisoners and they were not active law enforcement. (P. 822.)

The common thread running through the foregoing cases is the concept that the classification of a "safety member" engaged in active law enforcement is largely controlled by the extent to which the category exposes its holders to potentially hazardous activity. In all three cases the court considered whether the applicant's duties exposed him to potential dangers inherent in the arrest, detention or handling of prisoners, in maintaining institutional security or in transportation of prisoners, all part of active law enforcement. In *Ames* and *Kimball* they did, for their primary duties were to maintain security; in *Neeley,* they did not, and we conclude the same as to Glover.

While Glover's work placed him in daily contact with a limited number of minimum security prisoners, his primary duties—food preparation,

cooking and serving meals—were not hazardous, and this contact with inmates and occasional breaking up of fights among them did not convert his classification as head cook to the category of a member in active law enforcement, nor do his duties appear to be the kind of activity and Glover the kind of person the Legislature had in mind in conferring on "a member engaged in active law enforcement" the heart trouble presumption. (Gov. Code, § 31720.5.). He simply does not fit into this category. Glover was a cook, hired as a cook and worked as a cook; he was not a deputy sheriff, had no law enforcement duties, was not charged with maintaining security and did not arrest, detain, handle or supervise prisoners, as such, either in or out of the facility. ▓▓ As in *Neeley*, we are not unmindful of the rule that pension legislation should be liberally construed. "However, this rule of liberal construction is applied for the purpose of effectuating the obvious legislative intent [citation] and should not blindly be followed so as to eradicate the clear language and purpose of the statute and allow eligibility for those for whom it was obviously not intended. [Citations.]" (*Neeley* v. *Board of Retirement, supra,* 36 Cal.App.3d 815, 822-823.)

▓▓ Glover's job title was head cook, and his primary duty was to prepare and cook meals for inmates, and all other duties related thereto, i.e., supervising food preparation, ordering supplies, keeping records, training staff and inmate personnel, keeping meals within cost and inspecting foodstuffs. Appellant quotes from a job analysis that Glover "is responsible for handling any emergency that may arise in the culinary unit at HOJJ," suggesting this translates into a job duty of "handling" prisoners. Inasmuch as "[a]ny emergency" is not defined, we are left to speculate: it could relate to breaking up fights between inmates, as urged by appellant, but more likely refers to emergencies in the kitchen such as shortage of cooks on a given day and the necessity to fill in, running short of food for a meal and substitution of items on the menu, refusal of his staff to work, etc. ▓▓ However, Glover's ultimate status should be based on the duties he actually performed and not the duties listed in a job analysis or other documents. (*Neeley* v. *Board of Retirement, supra,* 36 Cal.App.3d 815, 818, fn. 2, and cases cited therein.)

▓▓ While Glover supervised the food preparation and trained and worked with the inmate kitchen staff, he did not supervise them or handle them as prisoners, in a law enforcement capacity, but only as culinary workers, in his capacity of head cook; all of his duties were addressed to and his only interest was in producing the prescribed number of meals per day on time and according to the menu. He did work with the inmates in a confined area, they did work with knives and they occasionally did fight among themselves, but the "potential danger" inherent in his contact with them is as overblown by appellant as is the extent of his "handling"

prisoners. Glover personally never had trouble with any of his inmate staff, never had a fight with any and never had been threatened by an inmate; he had no problems with the inmates and got along well with them. The occasional breaking up of a fight among the inmates working in the kitchen was incidental and at most, minimal. It certainly was not an activity specified in any of his job duties; he was not the only civilian in the area, and civilian and law enforcement assistance nearby was available to him if there were problems. There were occasional fights among the inmate kitchen staff in every jail in which he worked, in some more than in others, but they did not seem to concern Glover who went about his business as head cook, "I had a job I had to do and I just did it"; "sometimes I had to stop the job and had to go do something else while it cools off and restart it, again." And his breaking up fights was not all that often. He did it "just sometime" and "sometimes" disarmed them but he had deputy sheriffs to help him and a lot of civilian employees around.

There was no free access to the knives used in food preparation; they were kept under lock and key in the custody of a deputy sheriff and were checked in and out by the deputy. Glover testified there were fights, but gave them short shrift. The evidence does not show how frequently fights occurred, what they were about, how they started, how many inmates were involved, whether the fights were among those using knives, whether threats were made, how he stopped the fights or resolved the arguments ("I always play both sides"), whether he was ever endangered or hurt or afraid. Glover offered no details about any incident. A testimonial picture of inmates running around the kitchen brandishing knives does not exist in the record before us; in fact, addressing Glover's counsel the trial court commented: "Well, the way you put it he spent all of his time breaking up these fights and watching the prisoners, when in fact he did not. He spent his time as the cook for the jail.

"MR. SINGER: I'm not saying that—

"THE COURT: And the—whatever he did, if he broke up a fight or argument between prisoners was just—as I read it, just an inconsequential part of his job.

"MR. SINGER: Well, the criteria talk about—

"THE COURT: Was minimally involved."

We can no more equate Glover's supervision of the food preparation by the inmate staff and occasional breaking up of a fight with the "handling" of prisoners associated with active law enforcement, as urged by appellant and

which was the primary duty of both Ames and Kimball, than we can hold that Glover's daily contact as head cook with inmates in a work relationship and "just sometime" breaking up an occasional fight, made him a "member engaged in active law enforcement." Glover did not "handle" the inmates as prisoners in the sense that he was involved in their arrest, detention, supervision, discipline, search or transportation or maintaining security, as in *Ames* and *Kimball.* He was strictly a cook and his contact with the inmates was solely on a work basis.

We reject appellant's contention that Glover was in the category that the heart disability he suffered must be presumed to be service-connected and he needed to make no further showing that his disability was service-connected, and thus was entitled to a service-connected disability retirement allowance.

## II

### SUBSTANTIAL EVIDENCE SUPPORTS THE FINDING THAT GLOVER'S EMPLOYMENT DID NOT CONTRIBUTE SUBSTANTIALLY TO HIS DISABILITY

Section 31720 of the Government Code provides, "Any member permanently incapacitated for the performance of duty shall be retired for disability regardless of age if, and only if: [¶] (a) The member's incapacity is a result of injury or disease arising out of and in the course of the member's employment, and such employment contributes substantially to such incapacity, or [¶] (b) The member has completed five years of service, and [¶] (c) The member has not waived retirement in respect to the particular incapacity or aggravation thereof as provided by Section 31009. [¶] The amendments to this section enacted during the 1979-80 Regular Session of the Legislature shall be applicable to all applicants for disability retirement on or after the effective date of such amendments."

▮▮▮ *Bowen* v. *Board of Retirement, supra,* 42 Cal.3d 572 articulates the standard which governs determination of the issue of service-connection in retirement cases. Said the court in construing the statute, "Therefore, we may rely on prior case law to define the appropriate test for industrial causation under section 31720. For example, in *DePuy* v. *Board of Retirement, supra,* 87 Cal.App.3d 392, 398-399 [150 Cal.Rptr. 791, 12 A.L.R.4th 1150], the court stated that an 'infinitesimal' or 'inconsequential' connection between employment and disability would be insufficient for a service-connected disability retirement. Instead, the court concluded that 'while the causal connection between the [job] stress and the disability may be a small part of the causal factors, it nevertheless must be *real* and *measurable.*

There must be substantial evidence of some connection between the disability and the job.' (*Id.,* at p. 399, italics added; cf. *Gelman* v. *Board of Retirement* (1978) 85 Cal.App.3d 92, 97 [149 Cal.Rptr. 225] [requiring a 'material and traceable' connection between employment and disability].)" (Pp. 577-578, fn. omitted.) The Supreme Court refused to apply the greater-than-50 percent employment causation urged by the Board. Mr. Justice Lucas in a dissent also rejected the 50 percent causation from employment test, and wrote, "However, to contribute 'substantially,' the amount attributable to employment must be more than a 'small' but 'real and measurable' amount of contribution. I believe that more is necessary than the 10 percent or less that *DePuy* and *Lundak* suggest." (P. 587.) Appellant's argument that, thus, *Bowen* tacitly approves the concept that a 10 percent or less employment causation would qualify one for a service-connected disability pension, is without merit. ■ First, a majority opinion stands on its own, and a private view expressed by a dissenting justice cannot be used to construe the majority opinion or to limit or affect its meaning unless the majority opinion expressly takes account of the dissent. "[A] majority opinion of the Supreme Court states the law and . . . a dissenting opinion has no function except to express the private view of the dissenter." (*Wall* v. *Sonora Union High Sch. Dist.* (1966) 240 Cal.App.2d 870, 872 [50 Cal.Rptr. 178].) Second, the Supreme Court did not rely on percentage, and the majority opinion in *Bowen* does not set a percentage standard. ■ *Bowen* did establish the substantial contribution test requiring substantial evidence of a "real and measurable" connection between the disability and employment. (47 Cal.3d at p. 578.)

■ The parties having stipulated Glover had a permanent disability and Glover, not being entitled to the heart trouble presumption, the burden was on him to prove by a preponderance of the evidence that such disability was caused by his employment. (*Chamberlain* v. *Ventura Civil Service Com.* (1977) 69 Cal.App.3d 362, 368-369 [138 Cal Rptr. 155]; *Lindsay* v. *County of San Diego Ret. Bd.* (1964) 231 Cal.App.2d 156, 162 [41 Cal.Rptr. 737].) ■ The superior court properly having exercised its independent judgment and weighed the evidence (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 139-140 [93 Cal.Rptr. 234, 481 P.2d 242]), our task is to review the record to determine whether the trial court's judgment is supported by substantial evidence. (*Wieser* v. *Board of Retirement* (1984) 152 Cal.App.3d 775, 783 [199 Cal.Rptr. 720].)

■ In a factual argument better left for the referee and the trial court, appellant picks and chooses her evidence, mainly the report of Dr. Dickstein who, she argues, was the only one who understood Glover's stress on the job, over the reports of Dr. Trostler and Dr. Wanamaker, accepted by the trial court, which she challenges as inaccurate and made without a full

understanding of the job stresses that confronted Glover. What appellant ignores, of course, is that the fact-finding function is that of the trial court, and we are bound by its determination (*Petrucci* v. *Board of Medical Examiners* (1975) 45 Cal.App.3d 83, 87 [117 Cal.Rptr. 735]); we cannot reweigh the evidence (*Guymon* v. *Board of Accountancy* (1976) 55 Cal.App.3d 1010, 1016 [128 Cal.Rptr. 137]). The trial court may accept the relevant and considered opinion of one medical expert over the other medical opinions even though inconsistent with them. (*Wieser* v. *Board of Retirement, supra,* 152 Cal.App.3d 775, 783.) It is readily apparent that the court accepted and relied upon the medical opinions of Dr. Trostler and Dr. Wanamaker, and expressed doubts that Glover did experience job stress; it is also apparent that the court concluded that if there was stress on the job, it was not a substantial factor in Glover's disability and that the risk factors were the substantial ones. In arguing to the trial court that there was an objective basis for finding that this was a stressful position, Glover's counsel pointed up problems with inmate help—refusal to work and destroying prepared food—and lack of cooperation from co-workers; but the court interrupted, "Except the fact is [Glover] didn't find it stressful. He liked his job. . . . [¶] Those things may, I guess, cause some people stress, and those are the normal, everyday things one encounters in every job."

Occupational history given by Glover to Dr. Trostler included a description of his work and duties then, "He enjoyed his work. He had no problems with the inmates nor his supervisors. . . . In regards to job-related stress Mr. Glover stated that he has been doing this type of work for so long he does not even consider it stressful. He cannot identify any specific stressors, except for the fact that he feels 'different' when he walks out of the jail." Dr. Trostler found that Glover had three of the most important risk factors known to be associated with the development of coronary artery disease—a history of hypertension, a history of cigarette smoking (1 pack a day from age 19), and hypercholesterolemia; in addition Glover had a strong family history of heart disease—2 siblings died of strokes and myocardial infarction and 1 brother survived a myocardial infarction; and he had a personal life that, Glover told him, was stressful in that his wife had a problem with alcohol for 15 or 20 years. "In regards to job related stresses Mr. Glover could not identify any specific job related stress. He got along well with the inmates and his supervisor. He stated he had been doing this type of work for so long (nearly forty years) that he does not even think of stress." Dr. Trostler concluded that Glover's heart disease evolved out of the risk factors mentioned, saw no evidence of any perceived job-related stress and concluded his cardiac disability did not arise out of his occupation with the county.

Glover gave a similar occupational history to Dr. Wanamaker: "[H]e got along well with his supervisors as well as the inmates. He had no personal problems with his employer or with the people working about him. He apparently took very little time off and put in a usual full day. Mr. Glover indeed appears to be a pleasant and amiable individual who appears to be happy and content with his then activities and responsibilities." "Certainly there is no evidence in the history as related by Mr. Glover that he had any unusual emotional problems of stress, unhappiness, except for a short note alluding to his wife having a problem of alcoholism." Noted also was the strong history of coronary artery disease in Glover's family. He concluded, "There does not appear to be any evidence of any stress of emotional nature with regard to his position and his responsibilities as Cook at the County's sheriff's office. We can also confirm and agree that there is no evidence of perception of any job stress as can be elicited from this applicant at this time. The risk factors as we have noted above of cigarette smoking over 40 years plus hypertension plus alteration of his lipoproteins are all prominent risk factors which made him the most likely candidate to suffer the unfortunate event of a massive coronary infarction. These factors are either inherited or self-induced and self perpetuating as noted by the constancy of the cigarette smoking and his hyperlipoproteinuria."

Appellant argues that because neither Dr. Trostler nor Dr. Wanamaker understood Glover's work stresses, they minimized, if not eliminated, the stressful circumstances under which Glover worked. First, we note that the occupational history appearing in both reports was that given personally by Glover; had he suffered the stress he claims, it seems absurd that he would not disclose them to the doctors. Dr. Wanamaker reported that Glover could not identify any job-related stress. Second, both doctors did know of his job environment, as reflected in their reports and the history Glover gave them; and Dr. Wanamaker's testimony on cross-examination before the referee established his knowledge of the conditions under which Glover worked.

The trial court rejected Dr. Dickstein's report which recited that Glover cited "a strong history of both physical and emotional stress in the course of his employment," concluding that Glover's heart disease was totally industrially related. The risk factors discussed and considered by the other two doctors were not mentioned in Dr. Dickstein's conclusion.

At the administrative hearing Glover became more specific. Even so, there is little edification about stressful conditions. Contrary to the information he gave to Dr. Trostler and Dr. Wanamaker, he attributed stress to his responsibility for preparing, cooking and serving the prescribed number of meals per day on time (especially when civilian staff members two or three

times a week failed to report and he had to pitch in and cook) and adhering to the menu (he never knew how a meal would turn out and if there was enough food); supervising food preparation; training the inmates and occasionally breaking up fights among them although there were deputies and a lot of civilian employees around. With his promotion as head cook there were more responsibilities which caused him more stress, and his work in jail made him tense and tight but after he "wakes up" he is relaxed.

The trial court had before it the entire record, including all of the reports submitted by Glover. As it had a right to do, it accepted the medical reports of Drs. Trostler and Wanamaker over the report of Dr. Dickstein and either rejected Glover's testimony particularizing the stress on the job, or accepted it but believed that the job conditions he considered to be stressful amounted to no more than usual for any other job and gave no more stress to Glover than they would to any other job holder. It is clear that it adopted the latter because it concluded, "those are the normal, everyday things one encounters in every job." Thus viewing the evidence in a light most favorable to the respondent we conclude that there is no substantial evidence of any "real and measurable" connection between Glover's employment and his disability, and that substantial evidence supports the trial court's judgment.

### DISPOSITION

The judgment is affirmed.

Woods (Fred), J., concurred.

**JOHNSON, J.**—I respectfully dissent.

I must confess, when I first started researching this case, I did not expect to find merit in the contention a cook could be "engaged in active law enforcement." However, as I dug deeper and as I learned more about what this particular cook did and the conditions under which he had to operate, I became convinced.

Before discussing where and how I differ with the majority opinion, I want to set forth the points of agreement. To begin with, I concede that if Glover is not entitled to the presumption granted those engaged in "active law enforcement" then the majority is correct in finding there is substantial evidence to support the denial of Glover's service-connected pension.[1] Con-

---

[1] I find this a closer question than does the majority, however. The evidence supporting the pension board's finding that Glover's employment did not contribute substantially to his heart problems was marginal, at best. It consisted essentially of two (out of three) physicians

versely, I believe it is fair to imply from the majority opinion my colleagues agree that if Glover indeed were entitled to the presumption then the evidence in the record would not support a denial of the pension.

To set the latter issue to rest, however, we have only to drop this particular, unusually robust presumption into the pool of evidence which moved the pension board and the trial court to deny Glover his pension. The first effect of the presumption, of course, is to shift the burden of proof from Glover to the board. No longer does Glover carry the burden of proving his heart condition was attributable to his employment. Instead the burden is placed on the pension board to prove Glover's employment did *not* contribute substantially to his heart trouble.

But the "active law enforcement" presumption goes far beyond merely shifting the burden of proof from pension applicant to pension board. It creates a *conclusive* presumption as to the critical issue in dispute in this case—whether Glover's heart condition derived from his employment or from other diseases unrelated to his employment. Government Code section 31720.5[2] states in part, "Such heart trouble so developing or manifesting itself in such cases *shall in no case be attributed* to *any disease* existing prior to such development or manifestation." In other words, where this presumption applies the pension board is foreclosed from attributing Glover's heart trouble to any disease existing prior to his heart attack.

---

who opined Glover's job as a prison cook did not cause him significant stress. The doctors had before them information Glover's working days were filled with situations calculated to produce stress in any ordinary person—locked in a kitchen with inmate workers who were armed with sharp kitchen knives and meat cleavers and who occasionally started fights he had to break up. Yet these physicians accepted at face value Glover's statements he was happy in his job and not particularly bothered by the fact he had to supervise a crew of armed inmates every day. One does not have to be an expert in psychology to recognize some people are unwilling to admit even to themselves the stress they are experiencing. Glover's acknowledged chain-smoking may have been a more accurate indicator of what his job was doing to his psyche—and to his heart—than any verbal reassurances he gave to the doctors who examined him.

Had I been the trial judge in this case I would have applied the "independent judgment" test to reverse the pension board's denial of Glover's claim even without the benefit of the "active law enforcement" presumption. For reasons suggested above, I would have given more credence to the expert opinion linking Glover's job to his heart condition than I would have given to the contrary opinion. However, our scope of review on appeal is quite different. It is not for us to apply our "independent judgment" to the record before the trial court. As the majority opinion emphasizes, our only role is to determine whether there was "substantial evidence" to support the trial court's exercise of that judgment. The evidence here was weak, but nevertheless reached the minimal threshold of being "substantial." On that basis—and that basis only—I subscribe to the majority's finding that in the absence of the "active law enforcement" presumption substantial evidence supports the denial of Glover's service-connected pension.

[2] All further statutory references are to the Government Code unless specified otherwise.

In finding the petitioner to be disabled as a result of nonservice-related causes, both the board and the referee relied exclusively upon the medical reports of Drs. Trostler and Wanamaker who referred to the petitioner's "major risk factors for hypertension and coronary artery disease." These risk factors included hypertension which was diagnosed five years prior to the disability, hyperlipoproteinuria, and cigarette smoking. They were deemed to be the major contributing factors to the petitioner's coronary disease. Indeed the pension board relied solely upon these preexisting diseases to deny Glover his service-connected benefits. This they could not do, assuming Glover was entitled to the "active law enforcement" presumption. For, the presumption instructs the pension board it shall in no case attribute "[s]uch heart trouble . . . to *any* [preexisting] disease. . . ." (§ 31720.5, italics added.)

I am led to conclude it would be impossible for any appellate court that had found Glover eligible for the "active law enforcement" presumption to nevertheless uphold the trial court's ruling in this case. Once this presumption enters the equation, it is apparent the pension board failed to meet its burden of proving Glover's heart trouble did not "arise out of and in the course of employment." Under section 31720.5, the petitioner's coronary disability cannot be attributed to the petitioner's preexisting diseases. Yet these preexisting conditions comprised the sole proof offered to establish Glover's disability was not service-connected. Accordingly, on the basis of evidence before the board in this case, it would have been compelled by the terms of section 31720.5 to have granted a service-connected pension to anyone who qualified as a member "engaged in active law enforcement."

I do not read the majority opinion as quarreling with this conclusion. Rather we differ only over the issue whether Glover indeed was a member "engaged in active law enforcement." Having established how and why this issue is critical to the outcome in this case, I now return to explain why I, unlike my colleagues, have become convinced this prison cook was eligible for the "active law enforcement" presumption.

The presumption applies to a member engaged in active law enforcement who is not a safety member. The majority opinion mentions two principal cases interpreting the phrase "active law enforcement," *Ames* v. *Board of Retirement* (1983) 147 Cal.App.3d 906 [195 Cal.Rptr. 453] and *Neeley* v. *Board of Retirement* (1974) 36 Cal.App.3d 815 [111 Cal.Rptr. 841]. In *Ames,* a county correctional officer whose position was not classified as a safety member for retirement purposes requested a writ of administrative mandate to be classified as a safety member. Relying on *Neeley* v. *Board of Retirement, supra,* 36 Cal.App.3d 815, the Fifth District reversed the lower court and held that Ames was engaged in active law enforcement because

he satisfied three criteria: (1) he had daily contact with prisoners, (2) he was exposed to hazards resulting from prisoner conduct, and, (3) he was exposed to risk of injury from the necessity of being able to cope with potential dangers inherent in the handling of prisoners.

The majority applies this three-pronged test to exclude Glover from the category of members "engaged in active law enforcement." I apply the same test but reach the opposite conclusion.

The majority takes the analysis one level deeper, however. They point to *Ames* along with its kindred case, *Kimball* v. *County of Santa Clara* (1972) 24 Cal.App.3d 780 [101 Cal.Rptr. 353], and emphasize both granted "active law enforcement" status to corrections officers while *Neeley* denied such status to a criminal identification technician. The majority gleans from these cases a single overriding criterion—"the extent to which the [job] category exposes its holders to potentially hazardous activity." The majority finds a prison cook to be like an identification technician and not like a corrections officer. I, on the other hand, applying the majority's own measure of "potential hazard" find this prison cook's duties, while obviously not identical to those of a corrections officer, to be much closer to those of a corrections officer than an identification technician who, after all, spends his days in comparative safety, far removed from criminals.

Glover was at various times a supervising cook and a head cook whose primary *official* duties were culinary and administrative. But whether an employee's service places him in active law enforcement is determined by the "service which is actually performed by an employee and not necessarily only that which is set out in his job description." (*Kimball* v. *County of Santa Clara, supra,* 24 Cal.App.3d 780, 785.) The record demonstrates Glover's position in reality required him to have daily contact with prisoners and to supervise prisoners working in his kitchen. These duties, in turn, exposed him to potential hazard on a daily basis.

The statement of facts in the majority opinion is replete with evidence all three *Neeley* factors were present. (Indeed it is difficult to square that statement of facts with the legal conclusions the majority reaches later in the opinion.) But it may be useful to review the full record and what it says about Glover's actual duties in the light of those factors and then in the light of the majority's own single-factor test.

The first prong of the *Neeley* test requires that the job entail "daily contact" with criminals or prisoners. The county's own job analysis specified Glover was "in daily contact with inmates, . . ." Elsewhere this job analysis indicates: "The Head Cook supervises food preparation and serving

of over 5000 meals a day. He is continuously *training* staff and *inmates* in this field." (Italics added.) Moreover, the record demonstrates Glover's kitchen crew consisted entirely or primarily of inmates at the various jails and camps in which he served. Thus, there is no disputing this first prong is satisfied.

The second prong of the *Neeley* test requires the employee to be exposed to hazards resulting from prisoner misconduct. Once again, the county's own job analysis points to "[p]roblems with inmate help." Furthermore, Glover testified to the occurrence of frequent fights among inmates. Additionally, the reports filed by all three doctors are replete with discussions of fighting incidents which Glover had to break up. One reason for the frequency of these fights was the nature of the Hall of Justice jail, a minimum-maximum security facility. Although the appellant's crews were minimum security inmates, the proximity of minimum and maximum security prisoners presented potential problems. Glover testified this combination was more troublesome since the inmates "did not have enough outlet."

Moreover, this prison cook's risk from prisoner misbehavior was doubled by the fact these were not unarmed prisoners. They had sharp kitchen knives up to 12 inches in length; they had meat cleavers; and they had heavy 5-foot wood and metal pallets. The majority emphasizes these potential weapons were kept under lock and key and were issued to the inmates by a deputy. Still, there is no denying the prisoners had these dangerous objects in their possession while on duty preparing food. I suspect it would be small consolation to most people that the inmates working beside and behind them had to account for their sharp 6- and 12-inch knives, their meat cleavers and heavy pallets at the end of each shift. This precaution may have protected the rest of the prison from an influx of these lethal weapons. It did little to protect Glover and his fellow cooks from exposure to the danger these weapons posed in the hands of the prison labor assigned to his kitchen.

The third prong of the *Neeley* test is that the employee be exposed to a risk of injury resulting from the necessity of handling prisoners. While he was head cook at the Hall of Justice jail Glover was responsible for any emergency arising at the culinary unit. At the other jail facilities in which he served, Glover had similar responsibilities for any fights or other emergencies which might break out while he was on duty supervising the kitchen. According to Glover's testimony, although he himself was never assaulted by an inmate, he had disarmed prisoners who had seized kitchen knives.

The county's own job analysis of Glover's position emphasizes Glover "is *locked in with inmates* that he instructs and works with while preparing

food for 1600 inmates." (Italics added.) The situation the job analysis describes hardly reflects those "unusual incidents or conditions which are typically of relatively short, intense duration" which have been found insufficient to qualify a member as one engaged in "active law enforcement."[3] Instead, a prison facility is fertile ground for tensions and resentment towards those similarly confined as well as others. Although at times there were deputy sheriffs available for assistance they were unarmed and thus of not much help in case an inmate suddenly attacked Glover with a 12-inch kitchen knife or wood and metal pallet. In fact, at the time of his heart attack, there was no deputy sheriff on duty in the kitchen area. Glover had to be escorted outside to a safe zone by a prison trusty.

It is true Glover's principal duties were not precisely those of a correctional officer. Yet he had similar responsibilities to "handle" the 10 to 40 inmates assigned to him each shift. He was similarly exposed to potential injury in carrying out these supervisorial responsibilities. He worked in close proximity with inmates on a daily basis and was responsible for containing any confrontation or dispute that might arise. Moreover, these inmates were armed with deadly knives and blunt instruments unlike the unarmed inmates with whom correctional officers typically deal. As the majority's own statement of facts concedes, although Glover himself was never assaulted by an inmate, he had broken up many fights, had disarmed prisoners, and had to "play both sides" to protect his own safety. There is nothing in the *Neeley* test to suggest a corrections officer or other employee must actually have been personally assaulted to be entitled to the "active law enforcement" presumption. It is exposure to the *risk* of injury at the hands of suspects or prisoners, not the actual suffering of such injuries, which generates the stress and entitles one to the benefits of this presumption.

It is not critical to my analysis, but I find it instructive to note the Fifth District has granted "active law enforcement" status to a category of employee whose duties are nearly identical to those of a prison cook—the prison work program supervisor. (*Barrett* v. *Stanislaus County Employees Retirement Assn.* (1987) 189 Cal.App.3d 1593, 1599 [234 Cal.Rptr. 900]) These work program supervisors happened to be employed at an "honor" farm. Even though this is a minimum security facility, the court had no trouble ruling they were entitled to be reclassified as "safety members" of the pension system, if they were willing to pay in any accrued pension contributions. Unlike traditional corrections officers, these employees do not guard prisoners, as such. Instead, like Glover and other prison cooks, they supervise prisoners in the performance of certain work functions. The prisoners might be turning big rocks into little stones, raw steel into license

---

[3] Section 31470.3 and discussion at pages 1346-1347, *post.*

plates, or performing similar productive activities. Those supervising them must "handle" these prisoner work crews and risk harm at their hands for the same reasons and to the same degree as Glover did while supervising the inmate crews assigned to produce food in his kitchen. I see no reason to deny prison cooks who are asked to perform their cooking responsibilities with prisoner crews the same "active law enforcement" status accorded other prison work program supervisors.

I conclude this opinion by applying the "single prong" test the majority distilled from *Ames, Neeley,* and the underlying statutes. That test, as will be recalled, asks "the extent to which the [job] category exposes its holders to potentially hazardous activity." I agree with my colleagues this is the proper standard. It is the potential danger from working with criminals or crime that is the touchstone, not the particular way in which the danger arises. Nor is it required the potential danger have become actual. Rather it is the seriousness of the hazard and the constancy of the risk.

To my mind, the majority misapplies its own test when it emphasizes Glover was never actually assaulted and only occasionally had to break up fights between inmates. The *risk* of assault was always there and indeed assault by a very deadly weapon, not merely fists. Similarly, fights between inmates requiring Glover's intervention may have been only occasional happenings. But the *risk* was constant. So was the risk a fight between two prisoners might escalate into a general melee or that one of the combatants might turn on the intermeddler, Glover. Therefore, section 31470.3 disallowing "active law enforcement" status to those, like deputies serving as clerks and stenographers, who only occasionally are asked to expose themselves to the *risk* of dangerous activities has no application to this case. Here, as is almost always the case with those engaged in active law enforcement, the *risk* was constant but the dangerous incidents rather infrequent. The clerk or stenographer, on the other hand, works in a nearly risk-free environment over 99 percent of the time. Only when an emergency arises is there a possibility he may be drafted into a *temporary* assignment which exposes him for that brief period of time to a *risk* of harm from criminal activity.

In applying the majority's test, I ask whether a reasonable person would feel "exposed to potentially hazardous activity" were he or she locked up most of the day giving orders to 5 or 10 or as many as 40 criminals who were armed with sharp knives, meat cleavers and pallets, and now and again erupted in violent fights. The answer I arrive at is that anyone in Glover's job would have to be *un*reasonably oblivious or foolhardy to feel otherwise. The trial judge himself conceded, "I've been in the jail, and I got to tell you just walking in there is stressful." If the judge feels that way

when steel bars separate him from unarmed inmates how much greater is the exposure to potentially hazardous activity when one is on the other side of the bars, locked *in* with the prisoners and, worse yet, when those prisoners are armed with lethal weapons.

I do not wish to be misunderstood as arguing for the proposition every cook is "engaged in active law enforcement." Accurately stated, Glover's "job category" was not merely "a cook" or "a head cook." The term *"prison* cook" captures more of the reality of Glover's employment, but still is not sufficient in itself to place him in "active law enforcement." What exposed Glover to hazardous duty was the fact we have chosen to operate our jail kitchens with inmate labor rather than paid civilian staff. A fully descriptive title for his position would be something along the lines of "cook and prison inmate supervisor."

If and when we were to shift to full-time paid kitchen staffs in our jails, the cooks and head cooks in those jails would no longer be "engaged in active law enforcement," at least as I would construe the term. But in the meantime, I would regard it as fundamentally unfair for the public to save money by thrusting these cooks into an environment which exposes them to potentially hazardous activity at the hands of prisoners, yet deny them the benefit of the heart attack presumption which this environment justifies. In my view, for reasons discussed in this opinion, the public—as represented by our Legislature—intends no such result. Properly construed, section 31720.5 was designed to extend the heart attack presumption to all those, including prison cooks, who as part of their public employment are exposed on a regular basis to potential danger from criminal suspects and imprisoned criminals.

In furtherance of section 31720.5 and the public policy it implements, I would reverse the trial court and order issuance of a service-connected pension to the late Mr. Glover.

Appellant's petition for review by the Supreme Court was denied January 18, 1990. Kennard, J., did not participate therein.