[No. C061168. Third Dist. Apr. 26, 2010.]

RIVERSIDE SHERIFFS' ASSOCIATION et al., Plaintiffs and Appellants, v. BOARD OF ADMINISTRATION, CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Defendant and Respondent.

3

**COUNSEL**

Hayes & Cunningham, Dennis J. Hayes and Adam E. Chaikin for Plaintiffs and Appellants.

Peter H. Mixon and Wesley E. Kennedy for Defendant and Respondent.

**OPINION**

**BUTZ, J.**—The Riverside Sheriffs' Association (RSA), as representative of current and retired Riverside County deputy coroners, appeals from a judgment denying its petition for administrative mandate. (Code Civ. Proc., § 1094.5.) The petition sought to overturn a decision of the Board of Administration of the California Public Employees' Retirement System (the Board) refusing to change the status of the deputy coroners from "miscellaneous" to "local safety members," a classification that would have substantially enhanced their retirement benefits.

The central issue in this case is whether the principal duties and functions of the deputy coroners "clearly" fall within the scope of "active law enforcement" as that term is used in Government Code section 20436, subdivision (a) (hereafter section 20436(a)).[1] Both the administrative law judge (ALJ) and the trial court found they did not. We agree and shall affirm the judgment.

## FACTUAL BACKGROUND

This case comes to us on a set of undisputed facts. The ALJ received extensive evidence, upon which he rendered a comprehensive set of factual findings. Both parties and the trial court accepted these findings as true and acknowledge that the issue involves a pure question of law.[2]

---

[1] Undesignated statutory references are to the Government Code.

[2] The Board hedges its bets by contending that "to the extent" RSA may be challenging the administrative findings of fact, we must apply the substantial evidence test. The argument is moot because RSA has conceded that the dispute involves a "pure question[] of law, not involving the resolution of disputed facts" and its briefs tender no separately headed argument challenging any of the factual findings made by the ALJ and accepted as true by the trial court. (Cal. Rules of Court, rule 8.204(a)(1)(B).)

First enacted in 1945, the Public Employees' Retirement Law (PERL) (as it is now referred to; § 20000 et seq.) established the Public Employees' Retirement System (PERS) for certain state and local government employees. (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 466 [14 Cal.Rptr.2d 514, 841 P.2d 1034] (*City of Huntington Beach*).) The Board manages and controls the system (§ 20120), makes such rules as it deems proper (§ 20121), and determines who are employees and shall be entitled to receive benefits (§ 20125). PERS members are classified as either "miscellaneous members" or "safety members." (§ 20371.) The latter group generally enjoys enhanced retirement benefits.

A "local safety member" is defined by statute to include local police officers, local sheriffs, firefighters, safety officers, *county peace officers*, and school safety members employed by the local public agency. (§ 20420.) The statute that is the center of this controversy, section 20436(a), defines "county peace officer" as follows: " 'County peace officer' means the sheriff and *any officer or employee of a sheriff's office* of a contracting agency, *except one whose principal duties are those of a telephone operator, clerk, stenographer, machinist, mechanic, or otherwise, and whose functions do not clearly come within the scope of active law enforcement service* even though the employee is subject to occasional call, or is occasionally called upon, to perform duties within the scope of active law enforcement service, but not excepting persons employed and qualifying as deputy sheriffs or equal or higher rank irrespective of the duties to which they are assigned." (Italics added.)

## PROCEDURAL HISTORY

Prior to 2005, the County of Riverside's contract with PERS provided that deputy coroners were miscellaneous members rather than local safety members. In 2005, RSA requested that PERS reclassify deputy coroners as local safety members.

The PERS staff refused the request on the ground that the duties of deputy coroners did not clearly come within the scope of active law enforcement. RSA appealed this determination and the matter was heard before an ALJ who held a plenary evidentiary hearing.

The ALJ issued a proposed decision denying RSA's application to reclassify the deputy coroners. The Board then adopted the ALJ's decision as its own.

RSA filed a petition for writ of administrative mandate in the superior court, seeking to overturn the Board's decision. The trial court determined that the facts set forth in the Board's administrative decision were undisputed

and that the only issue was whether the deputy coroners' duties satisfied the requirements of section 20436(a). Addressing the question as one of law, the court ruled that the principal function of the deputy coroners "does not involve the active investigation and suppression of crime, nor does it involve the arrest and detention of criminals." Although it viewed the issue as a "close factual question," the court could not conclude that the deputy coroners engaged in "active law enforcement" within the meaning of section 20436(a). The petition was therefore denied and RSA timely appealed.

*The functions and duties of the deputy coroners*

The factual summary below is drawn from the ALJ's decision, which was adopted by the Board.

1. *Statutory duties.*

■ Upon being informed of a violent, sudden or unusual death, a deputy coroner must proceed to the location of the body, examine it, make identification, inquire into the circumstances and manner of death, and order removal of the body for further investigation, disposition or release. (§ 27491.2.) If the decedent was driving or riding in a motor vehicle, the coroner must take blood and urine samples to determine the alcoholic contents of the body, if any. (§ 27491.25.) He or she must take charge of the decedent's personal effects at the death scene and safeguard the property until its lawful disposition. If the coroner's examination reveals that a police or criminal investigation may ensue, the body and related evidence must be preserved until law enforcement responds to the scene. (§ 27491.3.)

■ Applicants for deputy coroner must be of good moral character and meet the physical, mental and emotional standards for peace officers. (§ 1031.) To be appointed, an applicant must have completed a 64-hour arrest and firearms training course, as well as an 80-hour death investigation course. In contrast, county deputy sheriffs must undergo a 664-hour training course prescribed by the Commission on Peace Officer Standards and Training.

A deputy coroner carries a badge and wears a uniform that is indistinguishable from those of deputy sheriffs. While on duty, he or she is armed with a handgun, baton, pepper spray and safety vest. However, deputy coroners have only limited peace officer powers. (Pen. Code, § 830.35.) Unlike deputy sheriffs, their power to make arrests does not extend to any public offense committed within the state.

2. *Essential duties.*

Deputy coroners conduct investigations into the *causes of death*, as opposed to investigating crimes. While most death scenes do not involve

criminal conduct, some do, and in such cases, the coroner's investigation supports and parallels that of the appropriate law enforcement agency. A deputy coroner's duties include: receiving reports of death from physicians, law enforcement and hospital personnel; initiating investigations at death scenes to determine if death is due to homicide, suicide, accident or nontraumatic causes; securing scientific and pathological evidence such as clothing, weapons, drugs, body fluids; fingerprinting and attempting to identify the decedent; locating and notifying relatives of the decedent; speaking with physicians about the decedent's medical history and checking other medical records to determine the cause of death; ordering autopsies or other services from skilled technicians to aid in arriving at an exact cause of death; testifying in court; and preparing and signing death certificates. A deputy coroner's determination about the cause of death may initiate a criminal investigation.

3. *Exposure to hazardous activity.*

Despite their dry job description and infrequent need to investigate crimes and make arrests, deputy coroners are occasionally exposed to hazardous and emotionally charged situations. Death scenes may be located inside a meth lab, in the desert, down a ravine, behind an active fire line, or in a crashed vehicle on the highway. At some point in their careers, deputy coroners will probably enter the scene of a wrecked vehicle, exposing themselves to dangers from crushed metal and flying glass. Traffic fatality scenes often require close contact with blood, urine, feces and other bodily fluids and substances. Deputy coroners have had to hike through difficult and rugged terrain to reach a body, sometimes using rope and other equipment. They need to wear protective clothing when coming into contact with a decedent who is HIV positive or carrying another infectious disease. Moving a corpse weighing more than 300 pounds, as deputy coroners have done, requires considerable strength and agility.

The evidence disclosed one report of a deputy coroner being shot at while conducting an investigation at an Indian reservation. Ironically, however, coroners reported that the greatest risk of injury arose from notification of next of kin. These notifications occasionally involve emotionally charged and dangerous situations, since bearers of bad news can be blamed for the deaths of loved ones. Most coroners could recall at least one instance in which they drew a weapon while making a notification.

There are certain "implied expectations" placed on deputy coroners. They are expected to back up deputy sheriffs and other sworn peace officers when

requested, help clear residences and other structures, engage in crowd control, search suspects if another same-gender officer is unavailable, and make arrests while on duty whenever there is danger to property or persons. Although these expectations do not appear in any written document, meeting them is part of the job.

## DISCUSSION

RSA contends that both the Board and the trial court erroneously concluded that deputy coroners do not qualify as safety members under section 20436(a). Strongly emphasizing the hazardous nature of the work, RSA asserts that the duties of deputy coroners must be considered those of "active law enforcement" as that term has been interpreted in case law. While not disputing that the job is sometimes hazardous, the Board counters that deputy coroners do not qualify as active law enforcement because their *principal* duties do not involve crime suppression and the arrest and detention of criminals on a regular, as opposed to occasional, basis.

Where there is no substantial conflict in the evidence regarding the employees' duties, whether they qualify for safety status under the PERL is a question of law for the appellate court. (*Tuolumne County Deputy Sheriffs' Assn. v. Board of Administration* (1989) 209 Cal.App.3d 1236, 1238 [257 Cal.Rptr. 824] (*Tuolumne*).) Consequently, "we are not bound by either the [B]oard's or the trial court's determination which, though expressed as findings of fact, are but legal conclusions." (*Crumpler v. Board of Administration* (1973) 32 Cal.App.3d 567, 577 [108 Cal.Rptr. 293] (*Crumpler*).)

Although the interpretation of a statute is ultimately an exercise of judicial power, its contemporaneous interpretation by an administrative agency charged with its enforcement and interpretation (i.e., the Board) is entitled to great weight unless it is clearly erroneous or unauthorized. (*People v. Snyder* (2000) 22 Cal.4th 304, 310 [92 Cal.Rptr.2d 734, 992 P.2d 1102].)

■ "Our fundamental task in interpreting a statute is to ascertain the Legislature's intent so as to effectuate the law's purpose. [Citation.] 'We begin our inquiry by examining the statute's words, giving them a plain and commonsense meaning. [Citation.] In doing so, however, we do not consider the statutory language "in isolation." [Citation.] Rather, we look to "the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]" [Citation.] That is, we construe the words in question " 'in context, keeping in mind the nature and obvious purpose of the

statute . . . .' " ' " (*Hoschler v. Sacramento City Unified School Dist.* (2007) 149 Cal.App.4th 258, 263 [57 Cal.Rptr.3d 115].)

■ Section 20436(a) grants peace officer status to employees of a county sheriff's department only if their principal functions *clearly* come within the scope of active law enforcement service" (italics added), notwithstanding that they may occasionally be engaged in active law enforcement functions. The word "clearly" is defined as "unmistakable," "[b]eyond a question or beyond a reasonable doubt," and "[u]nequivocal." (Black's Law Dict. (6th ed. 1990) p. 251, col. 2.) Thus, unless we can say without hesitation that the deputy coroners are principally engaged in "active law enforcement," the Legislature has directed that peace officer status must be denied.

The phrase "active law enforcement" is not novel. The ALJ noted that the term is found in more than two dozen statutes and there are many cases construing the phrase in a variety of contexts.

Cases interpreting the phrase in the context of retirement law most often cite the definition found in the seminal *Crumpler* case. (*Crumpler, supra*, 32 Cal.App.3d 567.) There, the petitioners were animal control officers whose principal duties involved the enforcement of state and local laws pertaining to the licensing, control and maintenance of animals. They carried guns, wore police uniforms, sometimes used large police vehicles with police radios, and were occasionally called on to serve as backup units at the scenes of crimes. The board determined the animal control officers were not entitled to safety member status and accordingly had them reclassified into "miscellaneous membership." (*Id.* at pp. 571–574.) The superior court granted a writ of mandate overturning that decision. (*Id.* at pp. 573–574.)

Interpreting a statute with wording very similar to section 20436(a) (former § 20020 [see now § 20425]), the *Crumpler* court reversed. The court declared that the phrase "active law enforcement service" "was no doubt intended to mean law enforcement services *normally performed by policemen.* As the Attorney General has suggested, it means *the active enforcement and suppression of crimes* and the *arrest and detention of criminals.*" (*Crumpler, supra*, 32 Cal.App.3d at p. 578, italics added, citing 22 Ops.Cal.Atty.Gen. 227, 229 (1953).) While animal control officers were engaged in active law enforcement "[i]n a loose sense," so were a myriad of other public employees. *Crumpler* concluded that the petitioners' regular duties failed to come within the special category the Legislature reserved for those who perform police-type functions. (*Crumpler*, at pp. 578–579.)

*Crumpler* was quickly followed by *Neeley v. Board of Retirement* (1974) 36 Cal.App.3d 815 [111 Cal.Rptr. 841] (*Neeley*), a case with many parallels to the present one. The respondents were identification technicians employed by the Fresno County Sheriff's Office. They carried badges and cards identifying themselves as deputy sheriffs, were required to take the same physical examination as safety officers, underwent training with batons, rifles, shotguns and other weapons, were required to be on 24-hour emergency call and had been summoned to active duty on rare occasions. (*Id.* at pp. 818–819.) However, their main duties consisted of gathering, analyzing and classifying evidence. (*Id.* at pp. 823–824.) The *Neeley* court, construing a statute with substantially identical wording as section 20436(a),[3] upheld the board's ruling that the sheriffs' technicians were not safety members engaged in "active law enforcement duties." The Court of Appeal noted that "[w]hile respondents' activities are related to and essential to law enforcement, they are not active law enforcement. Respondents are technical, administrative and support personnel for those officers who are on the firing line." (36 Cal.App.3d at p. 822.)

Finally, in *County of Sutter v. Board of Administration* (1989) 215 Cal.App.3d 1288 [264 Cal.Rptr. 233] (*County of Sutter*), this court held that family support investigators employed by the Sutter County District Attorney's Office were not safety officers, because their principal duties did not clearly fall within the scope of active law enforcement service. We reached this conclusion, acknowledging the fact that the investigators interviewed witnesses, prepared complaints and petitions for civil actions, arranged blood tests and necessary transportation, assisted in trial preparation of civil actions to establish and enforce child support obligations, and served papers in connection with the litigation. (*Id.* at pp. 1291–1292.) Noting that special retirement benefits are granted to safety officers in recognition of the hazards and stresses of their daily employment and citing *Crumpler*'s edict that active law enforcement means " 'law enforcement services normally performed by police[,] . . . the active enforcement and suppression of crimes and the arrest and detention of criminals,' " we held that the principal duties of the family support investigators could not be characterized as active law enforcement service. (*County of Sutter*, at p. 1293, quoting *Crumpler, supra,* 32 Cal.App.3d at p. 578.)

---

[3] *Neeley* addressed section 31470.3, which excluded from safety member status deputy sheriffs "whose 'principal duties clearly do not fall within the scope of active law enforcement, even though such a person is subject to occasional call, or is occasionally called upon, to perform duties within the scope of active law enforcement . . . .' " (*Neeley, supra,* 36 Cal.App.3d at pp. 817, fn. 1, 820.)

These cases all support the Board's ruling that the deputy coroners do not qualify for safety member status because their *principal* duties do not *clearly* fall within the scope of active law enforcement. While the evidence showed that deputy coroners are sometimes exposed to hazardous conditions, some of which are perhaps even greater than those in the cases cited above, their primary function is to investigate causes of death in unusual (both criminal and noncriminal) cases. Their normal duties do not include chasing or apprehending criminals or otherwise engaging in active crime suppression, even though they may, in unusual situations, provide logistical support to those law enforcement officers who are "on the firing line." Our conclusion is underscored by the fact that the statute itself expressly *excludes* sheriff employees who are only "occasionally" called upon to engage in active law enforcement service. (§ 20436(a).) Given the strong deference we must give to the Board's construction of its own statutes, we cannot say its determination excluding deputy coroners from safety member status was clearly erroneous.

RSA suggests that potential exposure to hazardous activity should be the most important factor in determining safety member status, citing the following quote from *Glover v. Board of Retirement* (1989) 214 Cal.App.3d 1327 [263 Cal.Rptr. 224] (*Glover*): "The common thread running through the foregoing cases is the concept that the classification of a 'safety member' engaged in active law enforcement is largely controlled by the extent to which the category exposes its holders to potentially hazardous activity." (*Id.* at p. 1333.) But the quote is taken out of context, and the *Glover* case actually undermines RSA's position.

In *Glover*, the plaintiff worked as a head cook in a minimum security jail. His job put him in daily contact with the inmates. Occasionally, he had been called on to break up fights and arguments among prisoners. Because the prisoners, some of whom were issued butcher knives for food preparation, were capable of harming him, the plaintiff had to keep a lookout at all times. He testified that his working conditions were "tense and tight." (*Glover, supra,* 214 Cal.App.3d at pp. 1330–1332.)

Nevertheless, the Court of Appeal refused to accept the argument that he was a "safety member" within the meaning of section 31720.5 (according a "heart trouble" presumption to disability retirement claims), because his "primary duties" were not those commonly associated with law enforcement. (*Glover, supra,* 214 Cal.App.3d at pp. 1333–1334.) Instead, his principal function was to cook meals for the prisoners. *Glover* contrasted the plaintiff's situation with that in *Ames v. Board of Retirement* (1983) 147 Cal.App.3d 906

[195 Cal.Rptr. 453], in which the correctional officer's "principal duties were the supervision of prisoners, detection of criminal activities within the jail, search of prisoners, confiscation of contraband materials, investigation of disciplinary matters, transportation of prisoners, prevention of escapes and apprehension of escapees with whatever force was necessary." (*Glover, supra,* 214 Cal.App.3d at p. 1333, citing *Ames, supra,* 147 Cal.App.3d at p. 916.)

Similarly here, a deputy coroner's principal function is to investigate and determine causes of death, not to engage in activities that involve direct contact with criminal suspects or the prevention of crime. Indeed, the ALJ made the uncontested finding that the coroners' duties rarely, if ever, required them to be the first responders to the scene of a crime, engage in physical confrontations, search suspects, clear residences or structures, engage in foot pursuits or high-speed chases, use weapons, or make arrests, all of which are tasks routinely associated with the job of peace officers.

RSA's reliance on this court's opinion in *Biggers v. Workers' Comp. Appeals Bd.* (1999) 69 Cal.App.4th 431 [81 Cal.Rptr.2d 628] (*Biggers*) is misplaced. Biggers was a bailiff whose job was to maintain security in the courtroom. We held that Biggers qualified as "active law enforcement" for purposes of workers' compensation benefits, noting that her duties required that she be engaged in such functions as making arrests, pursuing escapees, transporting prisoners between various locations and maintaining order in the courtroom. (*Id.* at pp. 436, 440.)

Apart from the fact that Biggers was regularly engaged in duties more closely akin to those of a peace officer than are coroners, the decision has limited utility here, since it was decided strictly as a workers' compensation claim under Labor Code section 4850. In fact, we stated that since employee classifications in pension statutes were not necessarily intended to be coextensive with those of workers' compensation law, Biggers's status *vel non* as a safety member under PERS was "irrelevant" to the resolution of her case. (*Biggers, supra,* 69 Cal.App.4th at pp. 437, 439.) It is doubtful Biggers would have prevailed had she claimed safety member status as a retiree, since appellate courts have uniformly rejected the contention that custodial jailers qualify as "safety members" under the PERL. (See *City of Huntington Beach, supra,* 4 Cal.4th at pp. 467–468; *United Public Employees v. City of Oakland* (1994) 26 Cal.App.4th 729, 733 [31 Cal.Rptr.2d 610]; *Tuolumne, supra,* 209 Cal.App.3d at p. 1239; *Schaeffer v. Public Employees' Retirement System* (1988) 202 Cal.App.3d 609, 613 [248 Cal.Rptr. 647].)

RSA also tries to enlist this court's decision in *City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29 [115 Cal.Rptr.2d 151] (*City of Oakland*) to support its claim that the infrequency of the coroners' involvement in active crime suppression activities is not dispositive, arguing that they are in a " 'constant state of readiness' " to do so when needed. We are not convinced.

*City of Oakland* involved airport firefighters who applied for safety membership under the PERL. The city denied they were engaged in "active firefighting" because they did not have frequent or regular contact with the hazards of firefighting. (*City of Oakland, supra,* 95 Cal.App.4th at p. 62.) Justice Morrison, writing for this court, pointed out that despite the infrequent need for their services, the firefighters' "principal" duties required them to be *first responders* to emergency situations arising at the airport, which included aircraft fires, hijackings, bombings, power failures, etc. (*Id.* at pp. 59–60.)

Unlike the firefighters in *City of Oakland*, deputy coroners are not the first responders to crime scenes or reports of criminal activity. Their primary role is to investigate and draw scientific conclusions about the causes of sudden or unusual deaths. Any involvement they may have with the perils of active crime fighting is purely incidental to their job.

In sum, while the duties of deputy coroners sometimes overlap with those of active law enforcement officers, their principal functions do not "clearly" fall within the category of active law enforcement, as section 20436(a) requires. We are mindful of the principle that pension statutes are subject to liberal construction and that ambiguity or uncertainty in pension legislation is to be resolved in favor of the pensioner. (*In re Retirement Cases* (2003) 110 Cal.App.4th 426, 473 [1 Cal.Rptr.3d 790].) "However, the purpose of the general rule that ambiguities should be resolved in favor of the employee is to effectuate legislative intent. This rule . . . should not blindly be followed so as to eradicate the clear language and purpose of the statute and allow eligibility for those for whom it was obviously not intended." (*Cory v. Board of Administration* (1997) 57 Cal.App.4th 1411, 1418–1419 [67 Cal.Rptr.2d 763]; see also *County of Sutter, supra,* 215 Cal.App.3d at pp. 1295–1296.)

Our decision is not meant to diminish the fact that the deputy coroners perform a valuable public service or that the dangers to which they are sometimes exposed are very real. However, our task is simply to interpret the statute as written. Should the RSA or the coroners desire to change the law, they may wish to take their case to the Legislature.

## DISPOSITION

The judgment is affirmed. Respondent Board shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

Sims, Acting P. J., and Nicholson, J., concurred.