[No. E002507. Fourth Dist., Div. Two. Apr. 2, 1986.]

STEVEN T. POWER, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD,
DEPARTMENT OF CORRECTIONS et al., Respondents.

COUNSEL

Seth J. Kelsey for Petitioner.

Richard A. Krimen, Michael J. Brodie, Arthur Hershenson, Fernando Da Silva and Louis Harris for Respondents.

OPINION

McDANIEL, J.—Petitioner Steven T. Power (applicant) seeks review of a decision after reconsideration by the Workers' Compensation Appeals Board (Board) determining that he did not sustain a psychiatric injury in the course of his employment with the State of California as a correctional officer at the Chino Institute for Men (CIM). We issued a writ of review and the matter is now before us for disposition. We conclude the determination of the Board is supported by substantial evidence and is not unreasonable. Accordingly, the Board's decision will be affirmed.

FACTS

On November 6, 1972, at the age of 22, applicant began to work as a correctional officer at the CIM. He was 5 feet 9 inches tall, and weighed approximately 200 pounds. About two years later, applicant started gaining weight. For the next eight years, he tried unsuccessfully to treat his weight problem with a supervised diet, medication, and psychotherapy. On Decem-

ber 22, 1982, at the age of 33 and a weight of 385 pounds, applicant stopped working at CIM.

### SYNOPSIS OF WCAB PROCEEDING

In September 1982, almost 10 years after he had begun working for CIM and 3 months before he left the institution, applicant filed an application for adjudication of claim, alleging he suffered an injury to his psyche during the period of employment caused by job stress and strain.

The following month, applicant was seen by a psychiatrist (Dr. Cohen), who diagnosed a moderately disabling, chronic posttraumatic stress disorder, causally related to employment and requiring psychological counseling.

About two months later, in December 1982, Dr. Cohen reevaluated applicant, and concluded that his condition had worsened and that he was by then temporarily totally disabled from all employment in the law enforcement field, with a slight to moderate degree of disability for all nonlaw enforcement employment. Shortly afterwards, Dr. Cohen's associate Dr. Spatz, a psychologist, began weekly psychotherapy sessions with applicant.

In January 1983, applicant was seen by a second psychiatrist (Dr. Walters), who concluded that applicant's obesity was unrelated to his work (noting that "[i]t is difficult to understand how this man blames his obesity on his job"), that no temporary psychiatric disability was present, and that there was no evidence of posttraumatic stress disorder.

In June 1983, the workers' compensation judge (WCJ) ordered that applicant be referred to an agreed medical examiner.

In September 1983, an agreed medical examiner (Dr. Kimmel) submitted a 38-page report in which he concluded that there was "no historical or clinical evidence of any posttraumatic stress disorder," and "no evidence of psychologically stressful industrial factors contributing to obesity or to any obesity-related work limitations."[1]

---

[1]More specifically, Dr. Kimmel's report provides in relevant part: "Concerning chains of causality, I am unable to relate the alleged work-inhibiting obesity of 1/83 to any individual or cumulative active work stress factors. From a psychiatric viewpoint, there is a distinct lack of evidence to validate the possibility of even an indirectly work-disabling chain of industrial causality." "In this case, the alleged cumulative and specific employment 'stresses' constitute no more and no less than a retrospective psychological convenience upon which Mr. Powers can assign some responsibility for long-standing feelings of frustrated personal aspirations and humiliating gross obesity to the passive stage of the workplace. I should also note the irrelevance of the seemingly tempting simplistic reasoning that since obesity developed concurrent within a decade of correctional work therefore correctional

In October 1983, applicant filed a report by Dr. Cohen and his associate Dr. Spatz which contained detailed criticisms of the report Dr. Kimmel had filed the previous month. Between December 1983 and May 1984, applicant filed one report by Dr. Spatz and two reports by Dr. Cohen, one of the latter being an annotated refutation of one of the assertions in Dr. Kimmel's report.

On May 4, 1984, and August 29, 1984, hearings on the application were held before the WCJ. He summarized applicant's testimony in relevant part as follows: "Applicant has had physical altercations with inmates about 15 or 20 times. He received some injuries and got some medical treatment. He investigated inmates that were killed . . . [I]n June or July 1975 [one of the dead inmates] died in his hands, and this was stressful to him. [¶] Prior to that, there were gangs fighting in the yard, and applicant had to break them up. There were also fires. An officer who was a friend of applicant's was attacked once. [¶] On the night shift, applicant carried a flashlight . . . but, otherwise, he carried no weapon. Applicant was fearful for his safety. [¶] In 1974 an inmate set himself on fire. Applicant arrived while his clothes and hair were on fire. Applicant was scared to death for himself and the inmate. . . . Dr. Kimmel didn't let applicant talk about his experiences at the prison [and] said . . . that applicant wasn't going to get a lot of money out of this case."

In September 1984, after the WCJ had issued his summary of evidence but before he had issued his findings and award, the State of California Department of Corrections and the State Compensation Insurance Fund (defendants) filed a motion that Dr. Cohen's and Dr. Spatz's supplemental reports and the WCJ's summary of evidence be sent to Dr. Kimmel for a final supplemental report. The motion was denied.

In November 1984, the WCJ issued his findings and award, which provided in relevant part that applicant had sustained temporary and total psychiatric disability arising out of and in the course of his employment; that the injury was not yet permanent and stable, and that further medical treatment was necessary. The issues of permanent disability and apportionment were taken off calendar. The WCJ gave the following as his reason for his decision: "Applicant's demeanor in court was very good. The court is persuaded that the events which applicant described at the prison actually oc-

---

work must somehow be responsible as an industrial stress factor. Such speculation does not correspond to the overwhelming weight of the psychiatric evidence in this case clearly pointing to a pattern of excessive food consumption that originated, persisted, and ultimately required attempts at medical control all unrelated to and independent of employment conditions." "In terms of permanent disability factors, the only work limitations necessary would involve jobs on which gross obesity would present a safety risk or physical fitness standards cannot be met."

curred. The court is also persuaded that those events caused applicant: to get very tense; to be fearful for his safety; to be scared to death; to be anxious and depressed, etc. [¶] The medical reports which were signed by [Drs. Cohen and Spatz] correlate well with applicant's testimony, and diagnose applicant's eating problem as a reaction to his job stresses.''

In December 1984, defendants filed a petition for a rehearing, contending among other things, that the WCJ erred in not allowing Dr. Kimmel to submit a supplemental report, and in ignoring the report which Dr. Kimmel did submit. The WCJ recommended denying the petition, responding, as to Dr. Kimmel's report, that he [the judge] had read it "several times and simply couldn't believe it!" The WCJ also stated that he had relied on Drs. Cohen and Spatz's reports because "Dr. Kimmel didn't seem to 'get a handle' on this case, whereas Drs. Cohen and Spatz did.''

In February 1985, the Board granted defendants' motion for reconsideration, rescinded the WCJ's decision, and returned the case to the WCJ for decision after Dr. Kimmel had had an opportunity to read the additional reports and the WCJ's summary of evidence, and to conduct another examination of applicant, if necessary.

In March 1985, Dr. Kimmel submitted a supplemental report, in which he stated that the additional evidence supported his initial reasoning and conclusions, and that no additional examination of applicant was necessary.

In April 1985, the WCJ issued an opinion on reconsideration, in which he *reinstated* his November 1984 findings and award.

Three weeks later, defendants filed a second petition for reconsideration. The WCJ recommended that the petition be denied. On June 28, 1985, the Board granted defendants' petition, rescinded the WCJ's April 9 decision, and issued a decision finding that applicant did not sustain an injury arising out of and occurring in the course of his employment, and ordering that applicant take nothing except for reasonable medical and legal costs.[2]

In support of its decision the Board reasoned in relevant part:

"While the Board is required to give great weight to a WCJ's findings, here giving great weight to the WCJ's finding because of his ability to observe the demeanor of the witnesses means that we should give great weight to his opinion as to applicant's credibility. However the question of

---

[2]The Board's decision was signed by two of its three-member panel. The third member dissented, stating he would affirm the WCJ's decision.

whether applicant is a credible witness is different from the question of which physician is the more persuasive one. The latter question does not depend on demeanor but instead calls for an evaluation of the physicians' reasoning processes.

"In reviewing the issues presented here in the light of the foregoing considerations, we begin by presuming that the agreed medical examiner has been chosen by the parties because of his expertise and neutrality. Therefore his opinion should ordinarily be followed unless there is good reason to find that opinion unpersuasive. Here in rejecting the opinion of the agreed medical examiner, the WCJ dealt with only one of the issues, i.e., applicant's credibility in re-counting [sic] the stress he was exposed to. But applicant's demeanor may be sincere, yet his attribution of his problems to his work may still constitute an after-the-fact rationalization.[1] [Fn. 1 provides: "If this is what occurred, the requisite causal relationship between the employment and the alleged injury would not exist. *Albertson's Inc.* v. *WCAB* 131 CA3d 308.47 CCC 460."] Also he may be sincere and have reacted emotionally, yet the emotional reaction that he had may not demonstrate psychiatric pathology but may instead demonstrate an 'occupational problem', which according to Dr. Kimmel would not fit into the category of psychiatric pathology. Therefore the conclusion that applicant is a credible witness does not in itself constitute a persuasive reason for rejecting Dr. Kimmel's opinion. . . .

"Dr. Kimmel, unlike Dr. Cohen actually confronts the issue of whether problems of the type applicant has constitute psychopathology or whether they instead are the non-pathological consequence of unhappiness with one's life situation. He also, unlike Dr. Cohen, critically evaluates the claim of employment causation and explains why he believes that employment causation, in the sense contemplated by the decision in [*Albertson's, supra*, 131 Cal.App.3d 308 [182 Cal.Rptr. 304]], does not exist. He then explains the reasons for his conclusions in a logical and convincing manner.

"For the reasons stated above, the Board believes that Dr. Kimmel's opinion is more persuasive than Dr. Cohen's."

Applicant filed a petition for reconsideration, and the Board denied the petition.

On review, applicant contends that the decision of the Board is not supported by substantial evidence and is unreasonable, because the Board failed

to resolve all reasonable doubts in applicant's favor and based its decision upon a purely " 'fanciful conclusion.' "[3]

DISCUSSION

■ "Although the employee bears the burden of proving that his injury was sustained in the course of his employment, the established legislative policy is that the Workmen's Compensation Act must be liberally construed in the employee's favor (Lab. Code, § 3202), and all reasonable doubts as to whether an injury arose out of employment are to be resolved in favor of the employee. [Citation.] This rule is binding upon the board and this court. [Citation.] ■ Moreover, although the board is empowered to resolve conflicts in the evidence [citations], to make its own credibility determinations [citations], and upon reconsideration to reject the findings of the referee and enter its own findings on the basis of its review of the record [citations], nevertheless, any award, order or decision of the board must be supported by substantial evidence in the light of the entire record [citations]." (*Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451].) ■ "[I]n making its own findings the board should resolve all reasonable doubts in favor of the employee in accordance with [Labor Code] section 3202 rule of liberal construction." (*Wehr* v. *Workers' Comp. Appeals Bd.* (1985) 165 Cal.App.3d 188, 195 [211 Cal.Rptr. 321].) "*[T]he section 3202 rule of liberal construction in favor of the employee does not apply to the burden of proof required by section 3202.5.*" (*Id.*, at p. 194, italics added.) "Nothing contained in Section 3202 shall be construed as relieving a party from meeting the evidentiary burden of proof by a preponderance of the evidence. '*Preponderance of the evidence' means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth.* When weighing the evidence, the test is not the relative number of witnesses, but the relative convincing force of the evidence." (Lab. Code, § 3202.5, italics added.)

■ Here the Board properly weighed the medical evidence on the issues of whether applicant had sustained a psychiatric injury, and, if so, whether

---

[3]The quoted term "fanciful conclusion" is apparently taken from *Insurance Co. of North America* v. *Workers' Comp. Appeals Bd.* (1981) 122 Cal.App.3d 905 [176 Cal.Rptr. 365], where the court stated: "Factual findings of the WCAB are thus not supported by substantial evidence in light of the entire record where such findings are . . . based upon a purely 'fanciful conclusion.' " (*Id.*, at pp. 910-911, citing *Simmons Co.* v. *Ind. Acc. Com.* (1945) 70 Cal.App.2d 664, 670 [161 P.2d 702].) In *Simmons*, an industrial compensation case, the reviewing court held that the report of a non-expert referee which differed from the reports of the Industrial Accident Commission's expert engineers was "merely a fanciful conclusion that does not raise the possibility of a conflict in the evidence," and thus was not substantial evidence upon which the commission could base its finding. (*Id.*, at p. 670.)

such injury was caused by his work. As to the threshold issue of psychiatric injury, the Board considered and rejected Dr. Cohen's diagnosis of post-traumatic stress disorder, stating in its decision: "The only physician who disagrees with Dr. Kimmel is Dr. Cohen. Yet when Dr. Cohen made his initial diagnosis of post-traumatic stress disorder, he found no evidence of psychotic thinking, he said that applicant's insight and judgment appeared intact, and found no evidence of significant personality disorder. The problems he described were with applicant's self-esteem, with applicant's concerns about his future and with the interpersonal difficulties he had with his supervisors because of his weight. Later when Dr. Cohen diagnosed a major depressive disorder, the symptoms he noted were such things as 'guilt, shame, self-reproach and very low self-esteem,' as well as 'chronic fatigue and loss of interest in pleasurable activities.' Dr. Cohen said that these problems warrant a psychiatric diagnosis.

"Dr. Kimmel in contrast, ascribed these problems to a non-pathological thought process. He said that the process that occurred here was that applicant had chronic feelings of personal insecurity, and gained emotional nourishment by excessive food consumption and that this led to his becoming obese. The obesity in turn led to problems with his supervisors about his weight. These problems combined with applicant's disillusionment as to his vocational choice [caused] applicant to be unhappy in his work environment and this then led to applicant's unhappiness and to a voluntary decision to leave the work environment. Dr. Kimmel then said that applicant chose not to place responsibility on himself for his unhappiness with his weight and choice of vocation, and instead retrospectively placed responsibility on the prison because it was more convenient to do that than to accept personal responsibility.

"*Dr. Kimmel, unlike Dr. Cohen actually confronts the issue of whether problems of the type applicant has constitute psychopathology or whether they instead are the non-pathological consequence of unhappiness with one's life situation.*" (Italics added.)

The Board's rejection of the WCJ's finding of psychiatric injury was not unreasonable, in that the WCJ relied solely on applicant's testimony and on the medical reports of Dr. Cohen and his associate Dr. Spatz, and completely ignored, or rejected without explanation, the reports of Dr. Walters and the agreed medical examiner Dr. Kimmel, the latter despite the fact that the WCJ had ordered applicant to be referred to an agreed medical examiner.

More specifically: (1) In the WCJ's five-page initial decision, there is no reference to either Dr. Kimmel or Dr. Walters.

(2) In the WCJ's report on defendants' petition for rehearing, the sole references to Drs. Kimmel and Walters are that he, the WCJ, had not ignored Dr. Kimmel's report but had read it several times and "simply couldn't believe it"; that he had relied on Drs. Cohen and Spatz because Dr. Kimmel "didn't seem to 'get a handle' on this case, whereas Drs. Cohen and Spatz did"; and that he "didn't rely on Dr. Walters or Dr. Kimmel." The WCJ gave no analysis of either Dr. Kimmel's or Dr. Walters' reports, and no reasons for rejecting such reports.[4]

(3) In the WCJ's opinion on rehearing, he referred only to Dr. Kimmel's opinion on the *causation* issue (that applicant's work environment did not cause any emotional disorder) and concluded: "This court is still persuaded that the events described by applicant occurred; that applicant reacted emotionally to those events; and that applicant's reaction caused him to be temporarily totally disabled and in need of medical treatment." In other words, the WCJ assumed, without discussion, that applicant's emotional reaction to his work constituted a psychiatric injury, and did not refer to Drs. Kimmel's and Walters' opinions that no such injury existed.

(4) In the WCJ's report on defendants' second petition for rehearing, he reissued his opinion on rehearing, with the following additions: "The court might add that Dr. Walters, in his report of January 4, 1983, said that applicant is '. . . reacting in his usual and habitual manner to life events, his environment, and his own internal needs.' (Underlining added.) ¶ "Thus, we have all four doctors saying almost the same thing. Doctors Cohen and Spatz diagnose applicant's eating problems as a reaction to his job stresses. Dr. Kimmel does not doubt the 'genuineness' of *applicant's perception* that his job stresses caused him to overeat. Dr. Walkers says that applicant is reacting, in part, to his environment. From the above, it is clear that applicant's overeating was caused by his reaction to the work stresses as applicant perceived them.

"Applying the age-old maxim that 'one takes the plaintiff as he finds him,' applicant was the type of person who would react to stresses by eating. He ate until he weighed over 400 lbs. Dr. Cohen took applicant off work so that he could receive psychotherapy away from the work stresses.

"The court would analogize this situation to a person who has a propensity to react to some chemical substance. The person then is exposed to that substance on the job and reacts to it. The person is then taken off the job

---

[4]Citing the WCJ's statement that he had read Dr. Kimmel's report "several *times and* simply couldn't believe it!" applicant claims that the WCJ "extensively analyzed *all* of the medical reports . . . something this BOARD did not do." (Original italics.) We disagree.

(out of the environment of the offensive substance), and is treated by a doctor for the reaction." (Italics added.)

As noted in his reference to Dr. Kimmel, the WCJ continued to rely on *applicant's* perception that his obesity was caused by his work, and to reject without analysis Dr. Kimmel's and Dr. Walters' opinions that no such causation existed. In addition, the WCJ's comparison of applicant's obesity to a reaction to a chemical substance shows that the WCJ continued tó *assume* that the obesity constituted or was a symptom of a pathologically disabling injury without considering Dr. Kimmel's or Dr. Walkers' opinions to the contrary. In view of such inadequacies, the Board acted reasonably and fully within its prerogative in rejecting the WCJ's findings, in declining to give substantive credit to applicant's testimony, and in finding that Dr. Kimmel's opinion as to the nonpathological implications of applicant's obesity was more persuasive than Dr. Cohen's.

██ "'[F]actual determinations of the board must be upheld if there is substantial evidence in their support and the relevant and considered opinion of one physician, though inconsistent with other medical opinions, may constitute substantial evidence.'" (*Place* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 372, 378 [90 Cal.Rptr. 424, 475 P.2d 656].) Here, the Board expressly relied on Dr. Kimmel's report in making its finding that applicant did not sustain an industrially-caused injury. Viewed in the light of the entire record (*Lamb* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 281 [113 Cal.Rptr. 162, 520 P.2d 978]), that report constituted substantial evidence to support the finding.

Applicant contends that Dr. Kimmel's report did not constitute substantial evidence, because its theory of industrial causation was based on "irrelevant and erroneous factual assumptions." However, applicant does not give examples of any such assumptions, and does not confront the threshold issue of Dr. Kimmel's determination that there was no evidence applicant had sustained a psychiatric injury.

Applicant also contends that Dr. Kimmel's theory of industrial causation was insubstantial because it was based on "'[g]uess, surmise or conjecture.'" (*Place, supra,* 3 Cal.3d at p. 379.) Not so. Applicant relies on *Lamb* v. *Workmen's Comp. Appeals Bd., supra,* 11 Cal.3d 274, a death benefits case, where the employer's medical witnesses had never seen the deceased employee, and testified in response to hypothetical questions that in their opinion the employee's work was not emotionally stressful. Here, however, Dr. Kimmel's report was based on a four-hour interview with applicant,[5]

---

[5] In his deposition, Dr. Kimmel said he spent most of the four hours listening to applicant.

and expressly took into account applicant's perception that his work was stressful. (Of course in *Lamb,* there was no threshold question of injury, because the employee died. Here, although applicant consistently ignores it, there was such a question, and it was decided against him.)

■ Applicant also contends that the Board erred in failing to resolve all reasonable doubts in his favor. However, in the light of the foregoing analysis, this contention is meritless, if not specious. The principle of resolving all reasonable doubts in favor of the employee applies "[w]hen there is no conflicting evidence and the inference [of industrial causation] is undisputed[.] [In such a case,] the board in furtherance of the legislative command of liberal construction in favor of the workingman must find industrial causation." (*Lundberg* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 436, 439 [71 Cal.Rptr. 684, 445 P.2d 300].) Here, however, the evidence as to both injury and industrial causation was conflicting. The WCJ did not properly address the conflict; the Board did.

Applicant seems to be arguing that *whenever* the evidence is in conflict, the principle of liberal construction *must* result in a finding in favor of the employee, irrespective of whether the evidence against him "has more convincing force and the greater probability of truth" (Lab. Code, § 3202.5, *supra*). Were this the case, however, the *preponderance* of the evidence standard in section 3202.5 would be meaningless, as would the review powers of the Board.

We note also, as pointed out in footnote number 3, *supra,* that the wording of applicant's contention, *supra,* that the Board's decision is based upon a purely "'fanciful conclusion'" is derived from *Simmons Co.* v. *Ind. Acc. Com., supra,* 70 Cal.App.2d 664, 670, where the conclusion in question was that of a *nonexpert* referee. Obviously, this is not such a case.

Finally, applicant's reliance on *Afshariani* v. *Workers' Comp. Appeals Bd.* ▌(Cal.App.), is misplaced, because the case has been vacated by our Supreme Court, and, in any event, is inapposite, because *Afshariani* is a death benefits case like *Lamb, supra,* 11 Cal.3d 274, where neither of the medical witnesses had had an opportunity to examine the employee.

After we filed our opinion, applicant petitioned for rehearing, contending that we had erred in failing to review the Board's denial of his petition for reconsideration. However, in his original petition here applicant did not

raise any issues in regard to such denial, and so nothing on the subject was presented for us to review.

DISPOSITION

The decision of the Board is affirmed.

Kaufman, Acting P. J., and Taylor, J.,* concurred.

A petition for a rehearing was denied April 2, 1986.

---

*Assigned by the Chairperson of the Judicial Council.