Filed 10/6/17; Certified for Publication 11/1/17 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PEARSON FORD et al., | D070915 |
| Petitioners, | |
| v. | (WCAB No. ADJ4081602) |
| WORKERS' COMPENSATION APPEALS BOARD, | |
| Respondent; | |
| LEOPOLDO HERNANDEZ, | |
| Real Party in Interest. | |

Petition for writ of review from a decision of the Workers' Compensation Appeals Board. Affirmed.

Kegel, Tobin & Truce and Jonathan S. Gower for Petitioners.

No appearance for Respondent.

Rose, Klein & Marias and Lorena M. Garza for Real Party in Interest.

In this case, we deny relief on a petition for review of an award of benefits made by the Workers' Compensation Appeals Board (WCAB). In specified circumstances, a

worker who engages in criminal fraud in attempting to recover workers' compensation benefits and is convicted of doing so is thereafter barred from recovering benefits growing out of the fraud. However, in given circumstances where, independent of any fraud, a worker is able to establish his or her entitlement to benefits, benefits may be awarded.

Here, the WCAB found evidence, independent of a worker's fraud, that he had suffered a compensable injury and was entitled to benefits. In doing so the WCAB relied on the determination of a medical expert. As we explain, we find no error in the WCAB's determination the workers' claim was not barred by his misdemeanor conviction for workers' compensation fraud and in the WCAB's adoption of the expert's finding of a permanent disability. Accordingly, we deny the petitioner any relief on its petition asking that we vacate the WCAB's award.

FACTUAL AND PROCEDURAL BACKGROUND

1. Injury

On March 24, 2006, while working at Pearson Ford, Leopoldo Hernandez accidentally slammed the trunk of a car on his left hand and crushed one of his fingers. Although no bones in his hand were broken, he was unable to continue working at Pearson Ford because of continuing pain in his hand and shoulder. Hernandez applied for and received workers' compensation benefits.

2.  Examinations 2006-2010

From 2006 through 2010, Hernandez was treated and examined by a number of physicians for severe pain related to his injury and with respect to his workers' compensation claim.

In November 2008, Hernandez was examined by a neurologist, who found some neurological abnormalities, and stated that Hernandez did "seem to have complex regional pain syndrome."  The neurologist noted and was concerned about the fact "the patient seems to be on multiple medications, yet continues to have severe pain."

The parties designated Dr. Byron F. King, an orthopedic specialist as an agreed medical examiner (AME).[1]  Dr. King examined Hernandez on March 31, 2009. Hernandez required the assistance of a Spanish-speaking interpreter.  Dr. King had some difficulty in examining Hernandez's left arm and hand; in particular, although Hernandez complained about his inability to use his left hand and arm, he would not permit Dr. King to perform grip or pinch strength tests on the hand.  In his March 31, 2009 report, Dr. King stated that Hernandez presented "a very difficult diagnostic dilemma in that he does not appear to make any effort to cooperate with requests for left upper extremity use activities."  Dr. King also noted that the condition of the soft tissue on Hernandez left

---

[1]  Parties typically select an AME because of their expertise and neutrality.  (See *Power v. Workers' Comp. Appeals Bd.* (1986) 179 Cal.App.3d 775, 782.)  "[W]orkers' compensation law favors agreed medical examiners in resolving medical disputes fairly and expeditiously."  (*Green v. Workers' Comp. Appeals Bd.* (2005) 127 Cal.App.4th 1426, 1444, fn. omitted.) Thus, an AME's opinion should be followed, unless there is good reason to find that opinion unpersuasive. (*Power v. Workers' Comp. Appeals Bd.,* at p. 782.)

hand was not consistent with Hernandez's total lack of use of it, which Dr. King observed during the examination. Dr. King diagnosed a crushed finger, moderately severe regional pain syndrome, a compromised ability to use his left hand, and a psychiatric element superimposed on the other conditions.

Some months after Dr. King's examination, between January 11, 2010, and May 5, 2010, Hernandez was examined three times by Dr. Walter Strauser. Dr. Strauser is a pain specialist and had been treating Hernandez. Dr. Strauser prescribed a number of medications for Hernandez, including opiates. On each of his visits to Dr. Strauser, Hernandez wore a sling on his left arm and complained of continuing severe pain and an inability to use his left arm and hand. After each examination, Dr. Strauser continued to provide Hernandez with pain medication, including an opiate.

Pearson Ford's workers' compensation carrier retained the services of a private investigator, who conducted video surveillance of Hernandez following each of the three visits to Dr. Strauser in early 2010. Following each visit, Hernandez was observed taking off his sling, using his left hand to get in and out of his truck or a car, using his left hand to steer his truck or car, and on one occasion stopping at a grocery store and using his left hand to carry a bag of groceries.

During the period Hernandez's visits to Dr. Strauser were being surveilled, he also had one appointment, on February 18, 2010, with an orthopedist, who specialized in treatment of the arms and hands, Dr. Greg M. Balourdas. Dr. Balourdas was acting as Hernandez's primary physician and working with Dr. Strauser in providing care for Hernandez. As he did when he was examined by Dr. Strauser, Hernandez appeared at his

4

appointment with Dr. Balourdas wearing a sling on his left arm. Although Hernandez stated that he continued to experience pain, Dr. Balourdas concluded that Dr. Strauser was managing Hernandez's pain effectively.

Following his visit to Dr. Balourdas, Hernandez was observed once again taking off his sling, driving his car and stopping at an appliance store where, using both hands, he lifted a washing machine into the back of the car he was driving.

3. Criminal Investigation

Following Hernandez's visits to Drs. Strauser and Balourdas and the video surveillance conducted by Pearson Ford's workers' compensation carrier, the district attorney commenced an investigation of Hernandez.

4. Reexaminations by and Deposition of Dr. King

While the district attorney's investigation was pending, and after Hernandez had been made aware of the surveillance videos, Dr. King was deposed on October 20, 2010. On December 13, 2010, following his deposition Dr. King examined Hernandez again. In his report on the examination and his review of the surveillance videos with respect to the videos, Dr. King stated: "I do not recall seeing any individual finger motion in the videos but this was difficult to confirm."

In comparing his previous March 31, 2009 examination of Hernandez's left hand and his then current examination, Dr. King stated that in his prior report: "I was unable to identify impairment as Mr. Hernandez would not allow a reasonable examination." However, at the second examination in December 2010, Dr. King stated: "I found today Mr. Hernandez was much more cooperative and I believe a meaningful examination was

5

accomplished." Dr. King further reported "Mr. Hernandez appeared to be much more comfortable today and he indicates his treatment with Dr. Strauser has been much more positive and helpful. He has improved function of the left upper extremity and the sensitivity has been considerably diminished which he attributes to the electrical stimulation device as well as the adjustment of medications recommended by Dr. Strauser." Hernandez did not wear a sling at the December 2010 examination and Hernandez demonstrated to Dr. King that he uses his left hand "as an assistive device and almost as a claw."

Dr. King performed a number of objective tests on Hernandez's left hand and concluded that it was severely compromised; Dr. King also concluded Hernandez continued to suffer from moderately severe regional pain syndrome, on which was superimposed a psychiatric functional disorder. Dr. King concluded that with respect to Hernandez's left hand, Hernandez had lost 85 percent of his preinjury capacity and that with respect to Hernandez's overall or "whole person," Hernandez had suffered a 38 percent impairment.

Dr. King prepared a supplemental report on August 24, 2011. With respect to the video surveillance, Dr. King once again reiterated his opinion that the videos were not very helpful in making any diagnosis because "it was difficult to identify any actual finger motions of the left hand other than using the left hand and thumb to hold and move objects. This is a gross motor skill not a fine manipulation motor skill." After reviewing various guidelines published by the American Medical Association, Dr. King altered his evaluation of Hernandez's left hand and whole-person impairments, and found 91 percent

6

left hand and 57 percent whole-person impairments.  He also found that Hernandez suffers from chronic regional pain syndrome.

5.  Conviction

In March 2011, Hernandez was charged with four counts of violating Insurance Code section 1871.4[2]; three counts were based on his three visits in 2010 to Dr. Strauser and one count was based on his 2010 visit to Dr. Balourdas.  Hernandez was also charged with insurance fraud within the meaning of Penal Code section 550 subdivision (b)(3).

On May 10, 2012, Hernandez pled guilty to one count of violating Insurance Code section 1871.4, based on his May 2010 visit to Dr. Strauser.  He was placed on summary probation and required to pay $9,000 in restitution.

6.  WCAB Award

On May 31, 2016, a Workers' Compensation Judge (WCJ), relying on Dr. King's conclusions found that Hernandez suffered a 70 percent permanent disability and was entitled to a disability indemnity, a life pension and future medical benefits.  Pearson Ford, by way of a petition, asked the WCAB to reconsider the WCJ's determination.  On July 18, 2016, the WCAB denied Pearson Ford's petition and adopted the WCJ's report and conclusions.

Pearson filed a petition for writ of review, which we issued.

---

2      All further statutory references are to the Insurance Code, unless otherwise indicated.

7

DISCUSSION

I

In reviewing an award or decision made by the WCAB, we are governed by familiar principles. The WCAB's factual findings, when supported by substantial evidence are binding on us. (Lab. Code, § 5952; *Garza v. WCAB* (1970) 3 Cal.3d 312, 317; *LeVesque v. WCAB* (1970) 1 Cal.3d 627, 637.) In workers' compensation cases, as in other areas, substantial evidence generally means evidence that is credible, reasonable, and of solid value, which a reasonable mind might accept as probative on the issues and adequate to support a conclusion. (*Braewood Convalescent v. WCAB* (1983) 34 Cal.3d 159, 164.) We may not isolate facts which support or disapprove of the WCAB's conclusions and ignore facts which rebut or explain the supporting evidence, but must examine the entire record. (*Id.* at p. 164; *Garza v. WCAB,* at p. 317; *LeVesque v. WCAB,* at p. 637.) We may not reweigh evidence or decide disputed facts. (*Western Growers v. WCAB* (1993) 16 Cal.App.4th 227, 233.)

Although we review questions of law de novo, "we will give great deference to the WCAB's interpretation of the law unless it is clearly mistaken." (*Ogilvie v. WCAB* (2011) 197 Cal.App.4th 1262, 1271.) Moreover, we must recognize that the statutes governing workers' compensation, "shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment." (Lab. Code, § 3202; see also *Bontempo v. WCAB* (2009) 173 Cal.App.4th 689, 704.)

II

Pearson Ford's principal contention in this proceeding is its argument that any award to Hernandez for the injury he suffered in 2006 is barred by section 1871.5.

Section 1871.4 subdivision (a)(1) makes it a crime to: "Make or cause to be made any knowingly false or fraudulent material statement or material representation for the purpose of obtaining or denying any compensation, as defined in Section 3207 of the Labor Code." Section 1871.5 in turn provides: "Any person convicted of workers' compensation fraud pursuant to Section 1871.4 . . . shall be ineligible to receive or retain any compensation, as defined in Section 3207[3] of the Labor Code, where *that compensation* was owed or received as a result of a violation of Section 1871.4 . . . for which the recipient of the compensation was convicted." (Italics added.)

The parties agree the leading case interpreting section 1871.4 is *Tensfeldt v. Workers Compensation Appeals Board* (1998) 66 Cal.App.4th 116 (*Tensfeldt*). In *Tensfeldt,* a worker injured his knee playing basketball with his coworkers; he filed a workers' compensation claim and falsely stated he injured his knee while working as a plumber for his employer, a municipality. The municipality accepted the claim and paid the worker medical and temporary indemnity benefits. When the worker's false statement was uncovered, he was prosecuted and pled guilty to one count of misdemeanor fraud in violation of section 1871.4, subdivision (a)(1). However, before entering his plea the

3    Labor Code section 3207 provides: " 'Compensation' means compensation under this division and includes every benefit or payment conferred by this division upon an injured employee, or in the event of his or her death, upon his or her dependents, without regard to negligence."

9

worker filed a second, truthful claim in which he stated he had been playing basketball with coworkers when he was injured; because the game occurred during working hours, with his coworkers and the consent of his supervisor, he argued his injury was compensable.

In finding the worker's second claim was barred by section 1871.5, the court stated: "When an employee is convicted for fraud because of a lie *about the statutory compensability of an injury*, section 1871.5 precludes that employee from 'receiving or retaining' *all* workers compensation benefits, because the fraudulent misrepresentation is material to entitlement to *any* benefits under the Labor Code. Here, both the language of section 1871.5 and its obvious deterrent intent are consistent with this result." (*Tensfeldt*, *supra*, 66 Cal.App.4th at p. 124, emphasis added.) The court further found that the second claim would not support an award because his basketball injury was not compensable. (*Id*. at pp. 124–125.)

Importantly, the court in *Tensfeldt* took pains to expressly limit the scope of its holding so that section 1871.5 would not be used as an automatic or broad prohibition on the payment of benefits which were not directly connected to a worker's fraudulent misrepresentation. The court emphasized that "as a general rule these fraud cases must be determined on an ad hoc basis. *It is unworkable to attempt a fixed rule interpreting section 1871.5 to completely bar individuals convicted under section 1871.4 from forever receiving or retaining any workers' compensation benefits connected with a claim for an otherwise legitimate industrial injury, without regard for the specific facts of the case*. Nor would such an inflexible rule be justified by the plain language of section 1871.5."

10

(*Tensfeldt, supra*, 66 Cal.App.4th at p. 124; italics added.) Thus "[a]bsent a clear and express intention of the Legislature, we cannot interpret section 1871.5 to bar without qualification receipt of all classes of compensation benefits as a result of the fraudulent receipt of any one benefit unless there is substantial proof that those benefits in question were owed or received as a result of the fraud." (*Id*. at p. 126.) Accordingly, the court in *Tensfeldt* expressly permitted an injured worker to recover benefits, notwithstanding a conviction for workers' compensation fraud. "Entitlement to receive further compensation benefits after a fraud conviction necessarily will require (1) an actual, otherwise compensable, industrial injury; (2) substantial medical evidence supporting an award of compensation *not stemming* from the fraudulent misrepresentation for which the claimant was convicted; and (3) that claimant's credibility is not so destroyed as to make unbelievable concerning any disputed issue in the underlying compensation case." (*Id*. at pp. 125–126; italics added.)

The court in *Farmers Ins. Group v. Workers Compensation Appeals Board* (2002) 104 Cal.App.4th 684 (*Farmers*), considered application of section 1871.5 in a somewhat different context. In *Farmers,* a worker was receiving both a life pension and medical benefits. While receiving those benefits he fraudulently acquired $84,000 worth of medical footwear and was convicted of violating Insurance Code section 1871.4; in the criminal action he was ordered to pay his employer's insurer $84,000 in at a rate of $100 a month. In addition to the restitution order, the insurer asked the WCAB to provide it with a credit in the amount of the restitution order, against both his life pension and any further medical benefits he might claim. In finding that such a credit was not appropriate,

the Court of Appeal found that the worker's fraud was unrelated to either his life pension or most of his medical benefits, and that those benefits were therefore not subject to section 1817.5. (*Farmers,* at pp. 690–691.) The Court of Appeal did, however, permit the board to provide the insurer with a reimbursement credit against any further shoe purchases on the theory that under *Tensfeldt* a worker may be barred from receiving further compensation "directly stemming from the fraud." (*Id.* at p. 690.)

Here, the WCJ found Hernandez met the three requirements set forth in *Tensfeldt,* and the WCAB adopted those findings. The WCJ found that Hernandez suffered a compensable injury, there was substantial medical evidence supporting an award which did not stem from his fraudulent statements, and his credibility had not been so damaged as to make him unbelievable concerning the underlying compensation case. As to the first requirement, Pearson Ford does not challenge the WCAB's determination that Hernandez suffered a compensable injury. As to the third requirement, although Pearson Ford contends that Hernandez's credibility could not be restored, we are bound by what is plainly a credibility determination made by the board; that determination, made after extensive consideration by the WCJ does not appear to be wholly irrational, especially in light of the fact there is no dispute Hernandez in fact suffered a compensable injury and Dr. King stated that he relied on objective testing.

The WCJ's determination Hernandez met the second requirement is also vigorously disputed by Pearson Ford. Pearson Ford argues that because the record shows Hernandez misrepresented the extent of his injuries to Drs. Strauser and Balourdas, and those misrepresentations led to his conviction, any award of benefits for those injuries is

12

barred under *Tensfeldt*. We do not read either section 1871.5 or *Tensfeldt* so broadly. By its terms section 1871.5 only precludes compensation "owed or received *as a result of a violation* of Section 1871.4." (Italics added.) Thus, when, although a claimant has been convicted of fraud under section 1871.4, other evidence which was *not* the result of a violation of section 1871.4 supports a claim for benefits, section 1871.5 does not preclude the recovery of benefits. *Tensfeldt* itself recognized this limitation on application of section 1871.5 by expressly permitting an award of benefits when convicted claimants show substantial medical evidence *not stemming from the fraud* that led to their conviction. (*Tensfeldt, supra*, 66 Cal.App.4th at pp. 125–126.) The court in *Farmers* reached an analogous result by protecting benefits unrelated to the claimant's fraudulent shoe reimbursements from the restitution ordered as part of the claimant's conviction.

Here, Dr. King saw the surveillance tapes which led to Hernandez's conviction; nonetheless, based on his later examination of Hernandez, Dr. King concluded that notwithstanding Hernandez's apparent exaggeration of his symptoms to the physicians managing his pain and prescribing pain medications for him, Hernandez was suffering from a permanent disability. Dr. King's conclusion was based on his objective examination of Hernandez's left hand, rather than on any subjective reports by Hernandez; in this regard Dr. King's conclusion with respect to Hernandez's condition and its objective symptoms, was bolstered by the fact that during the course of his earlier examination he had not been able to perform any objective examination and had expressed no opinion based on what he observed. Thus, Dr. King's ultimate conclusion was sufficient medical evidence of a compensable injury to support an award and it was

13

evidence not induced, caused by, or the result of Hernandez's separate exaggeration of his injury to the pain specialist, Dr. Strauser, and the primary care physician, who was working with Dr. Strauser, Dr. Balourdas.

The circumstances here are in marked contrast to those considered by the court in *Tensfeldt*. Most importantly, unlike Hernandez's exaggeration of what was plainly a compensable injury, in *Tensfeldt,* the claimant's fraud as to when and where his injury occurred was necessary to establish his entitlement to any award; as the court in *Tensfeldt* noted, the claimant's later truthful claim showed he was not entitled to *any* benefits. Thus, in *Tensfeldt,* application of section 1871.5 did not deprive the claimant of any compensation to which he was otherwise entitled. Here, application of 1871.5 would deprive *Hernandez* of future benefits to which he was other otherwise entitled and thus would impose on him a fairly draconian penalty inconsistent with the overall purposes of the workers' compensation law. In these circumstances, and consistent with the requirement in *Tensfeldt* that each case of fraud be considered on its own, the WCAB did not abuse it discretion in finding there was material evidence of a compensable injury which was sufficiently independent of Hernandez's fraud to permit him to recover an award.

In sum, then, we find no error in the WCAB's unwillingness to apply section 1871.5.

14

III

We also reject Pearson Ford's contention that the restitution ordered by virtue of Hernandez's conviction somehow prevented any award of future benefits. The record does show that in the criminal proceeding, Hernandez was ordered to pay Pearson Ford's workers' compensation carrier $9,000 in restitution. However, there is no indication that this was a determination that Hernandez could not recover any further benefits growing out of his injury. (See *Farmers, supra*, 104 Cal.App.4th at pp. 690–691.)

IV

Pearson Ford also argues there was no substantial evidence to support the WCJ's finding of permanent injury because it contends Dr. King's conclusions do not conform with applicable diagnostic standards.

Under Labor Code section 4660, subdivision (b)(1), the determination of " 'the nature of the physical injury or disfigurement' shall incorporate the descriptions and measurements of physical impairments and the corresponding percentages of impairments published in the American Medical Association (AMA) Guides to the Evaluation of Permanent Impairment (5th Edition.)." "First published in 1971 to provide 'a standardized, objective approach to evaluating medical impairments,' (Guides § 1.1, p. 1), the AMA Guides sets forth measurement criteria that certified rating physicians and chiropractors can use to ascertain and rate the medical impairment suffered by injured workers. [Citation.]" (*Milpitas Unified School Dist. v. Workers' Comp. Appeals Bd. (Guzman)* (2010) 187 Cal.App.4th 808, 819.)

15

As the WCAB points out the AMA Guides are not meant to be a "rigid and standardized protocol . . . devoid of any clinical judgment." (*Milpitas Unified School Dist. v. Workers' Comp. Appeals Bd., supra*, 187 Cal.App.4th at p. 827.)  Here, Dr. King examined Hernandez, the surveillance videos, and was deposed three times.  He stated his conclusions and fully explained how he came to those conclusions, including a thorough explanation for what Pearson Ford contends were his departures from the AMA Guides. Given Dr. King's full explanation of his assessment and his presumed expertise as an AME, the WCJ and the WCAB could reasonably rely on his assessment of Hernandez's disability.  (See *Green v. WCAB, supra*, 127 Cal.App.4th at p. 1444; *Power v. Workers' Comp. Appeals Bd., supra*, 179 Cal.App.3d at p. 782.)

## DISPOSITION

We affirm the WCAB's decision.


BENKE, Acting P. J.

WE CONCUR:


AARON, J.


DATO, J.


16

Filed 11/1/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PEARSON FORD et al., | D070915 |
| Petitioners, | |
| v. | (WCAB No. ADJ4081602) |
| WORKERS' COMPENSATION APPEALS BOARD, | |
| | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Respondent; | |
| LEOPOLDO HERNANDEZ, | |
| Real Party in Interest. | |

THE COURT:

The opinion in this case filed October 6, 2017, was not certified for publication. It appearing the opinion meets the standards specified in California Rules of Court, rule 8.1105(c) the Unpublished Workers' Compensation Cases Review Committee's request pursuant to California Rules of Court, rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein to be published in the Official Reports.

BENKE, Acting P. J.

Copies to:  All parties
            Kenneth B. Peterson, Retired Associate Chief Judge, Workers' Compensation
            Appeals Board; Unpublished Workers' Compensation Cases Review
            Committee